IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FELDON J. JACKSON, JR.,

      Plaintiff,

    v.                                Civ. No. 23-96 MV/JFR

GEORGE STEPHENSON et al.,

      Defendants.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court on two motions. First, Defendant Gary Maciel's *Motion to Dismiss*, filed September 15, 2023. Doc. 11. Second, GEO Defendants' *Motion to Dismiss in Part, Motion for Partial Summary Judgment and Memorandum of Law in Support*, filed February 16, 2024. Doc. 23. The Court, having reviewed the parties' submissions and the relevant law, and being otherwise fully advised, concludes that both motions (Docs. 11 and 23) are well taken and recommends that both be **GRANTED**.

## I. PROCEDURAL HISTORY

On November 2, 2022, Plaintiff Feldon J. Jackson Jr., a pro se prisoner, filed suit in the First Judicial District Court of Santa Fe against Defendants George Stephenson, David Martinez, Nancy Maldonado, Moriama Valeriano, and Gary Maciel, in their individual capacities. Doc. 1-1 at 1-2. For purposes of clarity, Defendants Stephenson, Martinez, Maldonado, and Valeriano (but not Defendant Maciel) will be collectively referred to as "GEO Defendants."

In his Complaint, Plaintiff first alleges violations of the New Mexico Tort Claims Act (NMTCA) and 42 U.S.C. § 1983.[1] Doc. 1-1 at 1. Thereafter, Plaintiff alleges violations of the

---

[1] Plaintiff's Complaint initially miscites the statute as "28 U.S.C. § 1983." Doc. 1-1 at 1. Given the nature of the case and later usage of the correct citation, it is evident Plaintiff intended to cite 42 U.S.C. § 1983. *See, e.g.*, *id.* at ¶ 3.

Food Service Contract between NMCD and Summit Food Service Management. *Id.* at 8.

Preceding the prayer for relief, Plaintiff raises three additional claims, alleging Defendants

violated the "Religious Freedom Act,"[2] the Religious Freedom Restoration Act, and the

Religious Land Use and Institutionalized Persons Act. *Id.* at 9. In his discussion of these three

additional claims, Plaintiff–a Muslim–alleges that Jewish prisoners are treated more favorably

and that he cannot fully practice his religious beliefs–a clear attempt to raise First Amendment

and Fourteenth Amendment claims.[3] *Id.* Consequently, Plaintiff seeks $275,000 in

compensatory damages and $475,000 in punitive damages from each Defendant, totaling

$3,750,000. *Id.* Plaintiff also seeks a permanent injunction against all Defendants for

"retaliation, disciplinary action, harassment, transfer, and any other form of consequences that

may be instrumented against Plaintiff for bringing forth this Complaint."[4] *Id.*

On February 2, 2023, GEO Defendants, with Defendant Maciel's consent, properly

removed this case, asserting federal subject matter jurisdiction on the basis of federal question.

Docs. 1, 1-2; 28 USC §§ 1331, 1367(a), 1441(a); *see also* Doc. 8. On September 7, 2023, the

Honorable Martha Vázquez entered a Memorandum Opinion and Order denying Plaintiff's

request for remand (Doc. 3) and directed Defendants to answer the Complaint. Doc. 8 at 1, 7.

That same day, Judge Vázquez referred this case to the undersigned to conduct hearings, if

---

[2] It is unclear what statute the "Religious Freedom Act" is, but akin to Defendant's Maciel's assumption (Doc. 11 at 1 n.2), the Court will assume that Plaintiff meant the New Mexico Religious Freedom Restoration Act, N.M. Stat. Ann. §§ 28-22-1 to -5.

[3] While Plaintiff's Complaint does not directly cite the Constitution, his intent is apparent from the nature of this case and pursuit of a Section 1983 claim, a vehicle for suing state and local government officials who violate a plaintiff's constitutional rights. Doc 1-1 at 1-2; 42 U.S.C. § 1983.

[4] The Court notes that Plaintiff's filings contain unconventional capitalization, as Plaintiff frequently capitalizes most, if not all words. *See, e.g.*, Docs. 1-1, 7, 27. For stylistic purposes, the Court has adjusted this capitalization, as appropriate, when quoting Plaintiff.

warranted, including evidentiary hearings and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.  Doc. 9.

In lieu of an answer, Defendant Maciel filed a *Motion to Dismiss* ("Defendant Maciel's *Motion*") on September 15, 2023.  Doc. 11; *see* 14 C.F.R. § 16.26.  GEO Defendants filed their Answer on October 4, 2023.  Doc. 13.  The Court then ordered Defendants to file a *Martinez* Report.[5]  Doc. 14.  Defendant Maciel timely filed his *Martinez* Report on February 5, 2024 (Doc. 21).  On February 16, 2024, GEO Defendants timely filed their *Martinez* Report, (Doc. 22) as well as their *Motion to Dismiss in Part, Motion for Partial Summary Judgment and Memorandum of Law in Support* ("GEO Defendants' *Motion*") (Doc. 23).

In light of Plaintiff's serious ongoing health issues, the Court repeatedly extended Plaintiff's response deadlines.  *See* Docs. 25-26, 28, 30, 34, 37, 40-41; *see also* Docs. 27, 34, 38-39, 42.  Plaintiff was ultimately required to file four *separate* responses no later than February 10, 2025, to: (1) Defendant Maciel's *Motion* (Doc. 11), (2) Defendant Maciel's *Martinez* Report (Doc. 21), (3) GEO Defendants' *Martinez* Report (Doc. 22), and (4) GEO Defendants' *Motion* (Doc. 23).  Doc. 41 at 2.  Defendants' replies, if any, were due by March 12, 2025.  *Id.*  Plaintiff did not comply with the Court's instructions.[6]  It has since become evident that Plaintiff grouped

---

[5] The original deadline for Defendants' *Martinez* Reports was January 5, 2024.  Doc. 14 at 3.  But the Court granted Defendant Maciel one extension (Doc. 18) and GEO Defendants two extensions (Docs. 16, 20).  The orders granting these extensions also adjusted Plaintiff's deadlines to respond accordingly.  *See* Docs. 15 at 2, 17 at 2, 19 at 2.

[6] Upon receiving the Order Establishing New Filing Deadlines (Doc. 41), the LCCF Mailroom Supervisor informed Plaintiff that "pages [of the Order] were missing after being photo copied [sic]."  Doc. 48 at 1.  Despite knowing he did not have the complete Order, Plaintiff neither informed the Court nor requested a new/complete copy.  The Court is unpersuaded by Plaintiff's explanation for his noncompliance, considering the Court explicitly instructed Plaintiff to file separate responses on other occasions.  *See, e.g.*, Docs. 14 at 4, 37 at 1-2; *see also* Doc. 40 at 2 (Plaintiff's *Motion for Extension of Time*, where he indicated receiving Document 37).  Notwithstanding whether Plaintiff's failure to follow Court instructions could be construed as a failure to respond to Defendant Maciel's *Motion*, the Court must nonetheless address the merits of any motion for summary judgment or dismissal.  *Issa v. Comp USA*, 354 F.3d 1174, 1177-78 (10th Cir. 2003); *Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002).

his responses by Defendant. In other words, Plaintiff jointly addressed Defendant Maciel's filings in one response and GEO Defendants' filings in another.

First, Plaintiff responded to Defendant Maciel's *Martinez* Report on February 5, 2025. Doc. 43. Although Plaintiff's Response lacked a title, the introductory sentence stated that it was in response to Defendant Maciel's *Martinez* Report. *Id.* at 1. Plaintiff further explained that he previously "felt no need" to separately respond to Defendant Maciel's *Motion* "knowing that the Court was ordering Defendants to file a *Martinez* Report . . . ." *Id.* Plaintiff provided further clarity in his response to Defendant Maciel's Notice of Completion of Briefing (Doc. 46), which called attention to Plaintiff's failure to respond to Defendant Maciel's *Motion*, by explaining that in his "Response to Defendant's [sic] Gary Maciel [sic] *Martinez* Report, Plaintiff addressed Defendant's Motion to Dismiss . . . ." Doc. 48 at 2.

On February 10, 2025, Plaintiff filed an Addendum. Doc. 44. Even though Plaintiff had only submitted his one Response, Plaintiff's Addendum concerned "all the Defendants [sic] request for summary judgment and dismissal based on the Religious Land Use Institutionalized Persons Act." Doc. 44 at 1. Therein, Plaintiff merely provided the Court a list of ten cases (eight of which are non-binding) with no pincites, context, or explanation, which supposedly "refutes any claims made by the above named Defendants." *Id.* In light of Plaintiff's subsequent combined Response to GEO Defendants' filings, the Court construes Plaintiff's Addendum to be additional authority for his arguments on RLUIPA made in both responses.[7]

---

[7] On multiple occasions, Plaintiff has provided the Court a long list of citations with no pincites or explanation as to how they relate to his arguments. *See, e.g.*, Docs. 44, 45 at 7-8, 51 at 3. Because the Court will not act as Plaintiff's advocate and parse through dozens of cases to make arguments on Plaintiff's behalf, the Court's understanding of how the Addendum applies to Plaintiff's other filings is therefore irrelevant. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) ("Despite the liberal construction afforded pro se pleadings, the court will not construct arguments or theories for the plaintiff in the absence of any discussion of those issues."). Further, other filings reflect Plaintiff's ability to use pin cites and appropriately place citations as needed. *See, e.g.*, Docs. 21-5 at 2, 22-1 at 30, 43 at 3, 6, 8, 10, 52 at 2-6, 8, 11, 13.

On February 14, 2025, Plaintiff filed a Response titled "Plaintiff's Reply to Defendants [sic] Response to Court Order [sic] *Martinez* Report." Doc. 45. Although the title and introduction fail to clarify which Defendants Plaintiff was addressing, Plaintiff stated that this Response was to Defendants' "*Martinez* Report, and request for partial summary judgment and dismissal with prejudice . . . ." *Id.* at 1. Since Plaintiff had already responded to Defendant Maciel's filings and only GEO Defendants filed such a motion, it logically follows that this was Plaintiff's joint Response to GEO Defendants' *Martinez* Report (Doc. 22) and *Motion* (Doc. 23).

Defendant Maciel filed the Notice of Completion of Briefing (Doc. 46) for his Motion on February 21, 2025, and his Reply (Doc. 47) in support of his *Martinez* Report on March 3, 2025. On March 10, 2025, GEO Defendants filed both their Reply (Doc. 49) to and Notice of Completion of Briefing (Doc. 50) for their *Motion* (Doc. 50).

Without leave of the Court, Plaintiff filed surresponses to Defendant Maciel's *Martinez* Report and GEO Defendants' *Motion*, on March 13, 2025, and April 4, 2025, respectively. Docs. 51, 52; *see* D.N.M.LR-Civ. 7.4(b) ("The filing of a surreply requires leave of the Court."). Although Plaintiff's pro se status does not relieve him of complying with the same rules of procedure as any other litigant, the Court has discretion in deciding whether to consider improper surresponses. *See, e.g.*, *In re Vaughan Co.*, No. 10-10759, 2014 WL 1347481, at *1 n.1 (Bankr. D.N.M. Apr. 4, 2014) (considering surreply that Defendant filed without leave of the Court despite explaining that "[o]rdinarily, the Court will not consider a sur-reply filed without permission."). Courts typically permit surresponses "where the [preceding] reply presents new arguments or new evidence." *Tellez-Giron v. Conn's Appliances, Inc.*, No. 17-CV-01074, 2018 WL 611361, at *4 (D.N.M. Jan. 29, 2018); *see also Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, No. 11-0103, 2012 WL 1132527, at *15 (D.N.M. Mar. 22, 2012). While

neither Defendant Maciel's nor GEO Defendants' Reply presented new arguments or evidence, the Court shall consider Plaintiff's improperly filed surresponses solely because they aid the Court in understanding Plaintiff's often incoherent and/or illegible allegations and arguments.[8] *See Fortner v. Young*, 582 F. App'x. 776, 778 (10th Cir. 2014) ("Like many . . . pro se district court pleadings, [Plaintiff's] arguments are prolix and lack cohesion, structure, and clarity."); *Anthony v. Alorica, Inc.*, No. 08-2437, 2009 WL 4611456, at *2 (D. Kan. Dec. 4. 2009), *aff'd*, 380 F. App'x 766 (10th Cir. 2010) ("[Plaintiff's filings] are equally difficult to review meaningfully, due to their handwritten nature and obvious technical difficulties [like scanning] that must have occurred in filing.").

## II. RELEVANT FACTUAL BACKGROUND

Plaintiff is an inmate in the custody of the New Mexico Corrections Department ("NMCD"), where Defendant Gary Maciel is, and was at all times relevant to the Complaint (Doc. 1-1), the Director of Adult Prisons.  Docs. 1-1 at ¶ 12, 22 at 2 ¶ 1.  NMCD oversees multiple prisons throughout the state including the Lea County Correctional Facility ("LCCF") in Hobbs, New Mexico, which is operated by The GEO Group, Inc. and where Plaintiff was housed at all times relevant to the Complaint.  Doc. 22-1 at 1 ¶ 1; *see* Docs. 22 at 2 ¶ 1, 1-1 at ¶ 2.  The other four Defendants, collectively referred to as "GEO Defendants," are, and were at all times relevant to the Complaint, employed at LCCF in the following capacities: Defendant Stephenson as the Facility Administrator, Defendant Martinez as an Assistant Facility Administrator, Defendant Valeriano as the Grievance Coordinator, and Defendant Maldonado as the Food Services Manager.  Doc. 22 at 2-4 ¶¶ 3-4, 8, 11, 15.

---

[8] Of note, Defendants did not move to strike Plaintiff's improper filings.  *See* Fed. R. Civ. P. 12(f).

Summarized briefly, this case arises from Plaintiff's allegations that the halal diet he received as a Muslim inmate on the Islamic Religious Diet at LCCF was neither religiously (i.e. halal) nor nutritionally sufficient in two distinct respects.[9]  *See generally* Doc. 1-1.  First, under the Islamic Religious Diet at LCCF, Plaintiff receives one prepackaged halal dinner every day. *Id.* at 4; *see also* Doc. 22-4 at 2-5 ¶¶ 5, 8, 11.  Each week, two dinners contained halal-certified meat, and the five others were vegetarian meals dually certified as both kosher and halal.  Doc. 22-4 at 2, 5-7 ¶¶ 5, 11, 15; *see also id.* at 41.  Plaintiff received the same breakfast and lunch as the general population, who received meat with every lunch and four breakfasts a week.  Docs. 1-1 at 4, 21-8 at 39.  Because Plaintiff's religious tenets require that he only eat halal meat (meaning it must be killed, butchered, and prayed over in a precise manner) he would receive a protein alternative when the general population received meat.  *See* Doc. 1-1 at 4; Doc. 22-4 at 2-3 ¶¶ 5, 8.  Plaintiff contends that this diet was inadequate because he received less meat, the halal meat lacked variety, the meals were prepared by non-Muslims in a shared kitchen, and the meat-free prepackaged dinners were dual certified as kosher and halal.  Doc 1-1 at 4-8; *see also* Doc. 22-1 at 33.  Second, Plaintiff asserts that on numerous occasions, he and the other inmates were served the same repetitive vegetarian meals for multiple consecutive days.  Doc. 1-1 at 7; *see also* Doc. 22-1 at 4, 7, 30, 33.  As a result, Plaintiff wants three prepackaged meals a day, consistent with the accommodations provided to Jewish inmates on a kosher diet.  Doc. 1-1 at 7; *see also* Docs. 1-1 at 9, 22-1 at 31-33.

On October 22, 2020, Plaintiff requested to be placed on the Islamic Religious Diet by submitting the "Request for Religious Diet" form and "Religious Diet Participation Agreement."

---

[9] Plaintiff claims that this case "is rather unique in the sense that no one has ever brought a claim against Defendants regarding 'halal' meals . . . ."  Doc. 27 at 2.  However, as evidenced in the analysis and citations herein, judges in the District of New Mexico have handled multiple directly on point cases.

Doc. 22-4 at 26-27; *see also* Doc. 21-2 at 2 (NMCD Policy 101400(B)(1)-(2)).  Therein, Plaintiff

cited the Surah-Al Ma'idah of the Quran as authority for his abstention from pork, pork

byproducts, shellfish, blood, and meat from already-dead animals.  Doc. 22-4 at 26.  Plaintiff's

request was approved on November 9, 2020.  *Id.*; *see also id.* at 3 ¶ 7.  Plaintiff was added to

Defendant Maldonado's halal roster on November 16, 2020.  *Id.* at 3 ¶ 7.  The next day, Plaintiff

began receiving halal meals.  Doc. 1-1 at 4.

     Inmate transfers are commonplace and frequent.  Doc. 22-4 at 7 ¶ 16.  On February 9,

2021, Plaintiff was transferred to Guadalupe County Correctional Facility ("GCCF") due to a

COVID-19 outbreak at LCCF.  Doc. 1-1 at 4.  While at GCCF, Plaintiff allegedly received three

prepackaged halal meals a day.  *Id.*  Plaintiff remained at GCCF until he was transferred back to

LCCF on July 30, 2021.  *Id.*; *see also* Doc. 13 at ¶ 18.  From the record, it is unclear whether

Plaintiff remained at LCCF for the whole duration between July 30, 2021, and December 31,

2021.  However, and of the most relevance here, Plaintiff was housed at LCCF for all of 2022

through April 5, 2023.[10]  Doc. 22-4 at 7 ¶ 16.  During this time, Plaintiff filed two informal

complaints, two formal grievances, and one appeal.  *See* Doc. 22-1 at 6-8 (Plaintiff's first

informal complaint); *id.* at 3-5, 9-10, 23 (Plaintiff's first formal grievance); *id.* at 23-28

(Plaintiff's appeal of his first formal grievance); *id.* at 29-31 (Plaintiff's second informal

complaint); *id.* at 32-33 (Plaintiff's second formal grievance).

---

[10] Thereafter, between April 5, 2023, and June 2, 2023, Plaintiff was housed on and off at LCCF.  Doc. 22-4 at 7 ¶ 16.
Specifically, Plaintiff was housed at LCCF between April 8 through April 17, April 20 through May 30, and June 1
through June 2.  *Id.*  The Court infers that when Plaintiff was not at LCCF, during these times, he was in the hospital
or similar medical settings.  Plaintiff explained that he suffered two heart attacks in April of 2023.  Docs. 43 at 11, 45
at 5-6.  Plaintiff was transferred to the Central New Mexico Correctional Facility on June 2, 2023, where he remained
until July 18, 2023.  Doc. 22-4 at 7 ¶ 16.  Plaintiff was then transferred back to LCCF on July 18, 2023, where he has
resided ever since, except for when he was in and out of the UNM Hospital and the Long-Term Care Unit at LCCF.
*See* Docs. 25, 27, 34, 38-40, 42.

### A. **Plaintiff's First Informal Complaint**

Plaintiff first filed an informal complaint on March 20, 2022, against the Food Services Department and its staff.  Doc. 22-1 at 6.  Therein, Plaintiff asserts the following: (a) for four to five consecutive days, he received monotonous vegetarian lunches and dinners consisting of items like red beans, white rice, Spanish rice, diced potatoes, tomato sauce, apple sauce, cake, raw and cooked cabbage, and white bread biscuits; (b) although these items and the unspecified items in his breakfast meals did not contain pork or pork byproducts, Plaintiff contends they were still not halal (i.e. haram) under Islamic law; (c) aside from the prepackaged dinners, his meals (i.e., breakfast and lunch) were identical to those served to the general population; (d) when the general population received meat, he received cheese as a substitute, which he alleges is not halal and forced him to eat a strict vegetarian diet; (e) the three meals he received each day did not meet the basic daily calorie requirement, which he claims is 2,000 calories; (f) Jewish inmates received strictly kosher meals while Muslim inmates did not receive strictly halal meals; and (g) Food Services provided kosher meals in lieu of halal meals, which Plaintiff claims is impermissible under Islamic law because kosher meals, in his implied view, always contain prohibited ingredients.  *Id.* at 7-8.  The record clearly shows that Defendant Maldonado did not address Plaintiff's informal complaint.[11]  *See id.* at 6.

---

[11] It is somewhat unclear whether this lack of response was caused by Defendant Maldonado or Defendant Valeriano. According to NMCD Policy, inmates shall address their informal grievances to the institution's Grievance Officer (Defendant Valeriano), who "will log the Inmate Informal Complaint . . . [and] then forward the Inmate Informal Complaint to the Unit Manager, Chief of Security, or Institution's designee in charge of the informal resolution." Doc. 21-1 at 9 (NMCD Policy 150500(A)(1)(a)-(b)).  As such, Defendant Maldonado, as the appropriate designee, signed her name above the "Unit Manager/Chief of Security/Designee" line on Plaintiff's second informal complaint.  Doc. 22-1 at 29; *see also* Doc. 22-4 at 4 ¶ 10.  Due to Defendant Maldonado's role in Plaintiff's second informal grievance and Plaintiff's pleadings, the Court construes the lack of response to Plaintiff's first informal complaint to have been Defendant Maldonado's conduct.  *See* Doc. 1-1 at 6 ("Although Plaintiff's informal complaint was never addressed, Defendant Nancy Maldonado did respond to the grievance . . . .").  Regardless, although the Court construes reasonable inferences of the alleged facts in Plaintiff's favor, this detail does not impact the Court's analysis or the case's outcome.

**B. <u>Plaintiff's First Formal Grievance</u>**

Because Defendant Maldonado did not respond to Plaintiff's informal complaint within ten working days, Plaintiff proceeded to file a formal grievance on April 6, 2022. *Id.* at 3-5; *see also* Doc 21-1 at 10 (NMCD Policy 150501(A)(4) ("If the Inmate has not received a response to the Informal Complaint within ten (10) working days after submitting the Informal Complaint, the inmate may proceed to initiate a formal grievance.")). Therein, Plaintiff attached his previous informal complaint and listed the same issues as before. *Compare* Doc. 22-1 at 7-8, *with* Doc. 22-1 at 4-5. The relief Plaintiff sought, "with no exceptions," was to receive strictly halal meals that met "the daily required 2,000 calories" and included "poultry, whole ground beef, fish (except catfish), tuna." Doc. 22-1 at 3.

Defendant Valeriano received and accepted Plaintiff's grievance for investigation on April 7, 2022. *Id.* at 3. As NMCD policy permits (Doc. 21-1 at 4 (NMCD Policy 150500(C)(3)); *see also id.* at 11-12 (NMCD Policy 150501 (B)(3)(a))), Defendant Valeriano obtained a statement from LCCF's Food Services Manager, Defendant Maldonado, because she had the subject matter expertise necessary to process and resolve Plaintiff's grievance. Doc. 22-1 at 2 ¶ 5; *see also* Doc. 22-4 at 2-4 ¶¶ 4-5, 8-9. On April 20, 2022, Defendant Valeriano used Defendant Maldonado's statement, almost verbatim, as the basis for her investigatory findings and recommendation. *Compare* Doc. 22-1 at 23, *with* Doc. 22-4 at 3-4 ¶ 8.

In her statement, Defendant Maldonado cited the Religious Meat Alternative ("RMA") menu (Doc. 22-1 at 13-17) provided by the GEO Corporation. Doc. 22-1 at 23. The RMA menu includes protein substitutions of cheese, peanut butter, nuts, eggs, tofu, legumes, and pinto beans. *See id.*; *see also id.* at 28. Not only is the RMA nutritionally adequate, but inmates on it are offered slightly more calories, averaging approximately 3,100 calories per day. Doc. 22-4 at 3-5

¶¶ 8, 11.  In addition to citing the RMA menu, which was written by a registered, licensed dietician, Defendant Maldonado also cited the relevant statements of nutritional analysis and adequacy (Doc. 22-1 at 11-12) signed by Angela Bartolotti, the licensed (Doc. 22-4 at 72), Corporate Registered Dietitian.  Doc. 22-1 at 23; *see also* Doc. 22-4 at 3-4 ¶¶ 8-9.  In addition to her statement, Defendant Maldonado also provided Defendant Valeriano with relevant documents, including those she cited, to be provided to Plaintiff.  Doc. 22-4 at 4 ¶ 9.

Defendant Valeriano recommended denying Plaintiff's requested relief because based on the evidence, Food Services was following the RMA menu in providing Muslim inmates a halal diet.  Doc. 22-1 at 23.  Defendant Valeriano then provided her investigatory findings and recommendation to Defendant Martinez, who marked the grievance as resolved on April 22, 2025.  *Id.*; *see also* Doc. 22-3 at ¶ 4.  Dissatisfied, Plaintiff appealed.[12]  Doc. 22-1 at 23-27.

### C.  Plaintiff's Second Informal Complaint

Before Plaintiff's appeal was answered, Plaintiff filed a second informal complaint on June 3, 2022.  *Id.* at 29-31.  Therein, Plaintiff claimed that since May 29, 2022, he was again receiving monotonous meals, which included protein substitutions rather than meat.  *Id.* at 30-31.  Most of Plaintiff's second informal complaint mirrored his previous concerns and arguments.  *Compare* Doc. 22-1 at 4-8, *with* Doc. 22-1 at 30-31.  Of note, however, is that Plaintiff clarified how LCCF Food Services allegedly fulfilled kosher dietary restrictions as compared to halal dietary restrictions.  Doc. 22-1 at 31.  Specifically, Plaintiff accused Food Services of providing Jewish inmates three prepackaged meals a day, while Muslim inmates only received one prepackaged meal a day at dinner.  *Id.*

---

[12] The record does not state the exact date Plaintiff appealed the results of his first formal grievance.  However, Defendant Valeriano returned the grievance to Plaintiff on April 25, 2022, (Doc. 22-1 at 23) and inmates have five working days from receiving the decision to submit an appeal.  Doc. 21-1 at 13 (NMCD Policy 150500 (D)(1)).  Therefore, Plaintiff assumedly filed his appeal sometime between April 25, 2022, and May 2, 2022.

On June 14, 2022, Defendant Maldonado returned Plaintiff's second informal complaint, explaining that, as already addressed, LCCF follows the RMA menu, which fulfills the nutritional and caloric requirements.  *Id.* at 29.

### D.  Plaintiff's Second Formal Grievance

Dissatisfied again, Plaintiff filed a second formal grievance on June 17, 2022, while Plaintiff's appeal of his first formal grievance was still pending.  *Id.* at 32-33.  In addition to the issues already discussed, Plaintiff claimed that the conduct of Food Services' staff "swayed [him] away from practicing [his] religion according to Islamic law which includes eating meats that are lawful" by allegedly forcing him to consume a strictly vegetarian diet.  *Id.* at 33.  Plaintiff also accused Food Services of failing to provide him the same variety of meats (which he can eat *only if* prepared properly) that prisoners on other diets receive.  *Id.*  On June 23, 2022, Defendant Valeriano returned Plaintiff's second formal grievance because Plaintiff's concerns had already been answered in his previous grievance.  *Id.* at 32.

### E.  Result of Plaintiff's Appeal

Defendant Maciel resolved Plaintiff's appeal on June 30, 2022.  *Id.* at 28.  Defendant Maciel explained that Defendant Valeriano's findings were correct and similarly concluded that "[p]er the menu along with the substitutions the Halal diet is being provided by food service." *Id.*  In addition to the protein alternatives Defendant Valeriano listed in her investigatory findings (i.e., cheese, peanut butter, and pinto beans (*Id.* at 23)), Defendant Maciel added certified meat and poultry, seafood, nuts, eggs, tofu, halal deli meats, and legumes.  *Id.* at 28.  Defendant Maciel concluded by informing Plaintiff that his appeal was resolved, and his administrative remedies were exhausted.  *Id.*; *see* 42 U.S. § 1997(a).

### III. LEGAL STANDARDS

#### A. Motion to Dismiss

Fed. R. Civ. P. 12(b)(6) provides that a party may assert, by motion, the defense of failure to state a claim upon which relief can be granted. *See also* Fed. R. Civ. P. (8)(a), (d) (listing the prerequisites for a pleading to state a claim for relief). In deciding a motion to dismiss premised on Rule 12(b)(6), the Court accepts the factual allegations in the complaint as true and views them in the light most favorable to the plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). While the facts in the complaint need not be detailed, they must be sufficient to allow the Court to draw "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "[w]hile the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in [his] complaint, the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). Furthermore, pleadings offering "labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration, internal quotation marks, and citation omitted). Indeed, "[c]onclusory allegations are not entitled to the assumption of truth." *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (internal quotation marks and citation omitted). Consequently, a motion to dismiss gives plaintiff notice and opportunity to amend his complaint. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

In deciding a motion to dismiss challenging the legal sufficiency of a complaint, the Court generally must exclude extraneous material or convert the motion to one for summary

judgment. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017). "A district court may, however, consider documents attached to or referenced in the complaint if they are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id.* (internal quotation marks and citation omitted).

**B. <u>Summary Judgment</u>**

Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *see also Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008) (internal citations omitted); *see also Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). To carry its initial burden, the moving party need not negate the nonmoving party's claim. *See Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997), *cert. denied sub nom. Smith v. Allen*, 522 U.S. 1148 (1998). "Instead, the movant only bears the initial burden of ''showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex*, 477 U.S. at 325).

Once the movant meets this burden, the non-moving party is required to put in the record facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(c). Rule 56(c) requires "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c); *see also* D.N.M. LR-Civ 56.1(b). A plaintiff cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment but rather must produce some specific factual support of its claim. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988); *Fritzcshe v. Albuquerque Mun. Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002); *see also Applied Genetics Int'l v. First Affiliated Secs.*, 912 F.2d 1238, 1241 (10th Cir. 1990). Likewise, "only statements made with actual knowledge will support a motion for summary judgment; the court must disregard statements of mere belief." *West v. Norton*, 376 F. Supp. 2d 1105, 1118 (D.N.M. 2004) (citing *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)).

Upon a motion for summary judgment, a court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997) (citing *United States v. O'Block*, 788 F.2d 1433, 1435 (10th Cir. 1986)). The trial judge is not to weigh the evidence to determine the truth of the matter, but instead must ask "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  If there is no genuine issue of material

fact in dispute, then a court must determine whether the movant is entitled to judgment in its

favor as a matter of law.  *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996).

However, "the mere existence of *some* alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; the requirement is that there be

no *genuine* issue of material fact."  *Anderson*, 477 U.S. at 247-48 (emphasis in original).

### C.  Plaintiff's Pro Se Status and Use of the *Martinez* Report

In addition to the standards applicable to all motions for summary judgment or to

dismiss, the Court notes that Plaintiff's pleadings and responses were prepared without the

assistance of counsel.  It has long been the rule that pro se pleadings are construed with a greater

degree of liberality than those of a trained attorney.  *See Hall*, 935 F.2d at 1110, 1110 n.3; *Hill v.

Corrections Corp. of Am.*, 14 F. Supp.2d 1235, 1237-38 (D. Kan. 1998).  This rule requires the

Court to look beyond a failure to cite proper legal authority, confusion of legal theories, and poor

syntax or sentence construction.  *See Hall*, 935 F.2d at 1110.  However, it is inappropriate for a

court to assume the role of an advocate and read into a complaint facts or legal theories that are

simply not present there.  *See id.* at 1109-10; *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159

(10th Cir. 1991) ("[T]he court will not construct arguments or theories for the plaintiff in the

absence of any discussion of those issues.").  Additionally, the fact that Plaintiff is proceeding

pro se does not excuse his noncompliance with every litigant's duty to comply with the

fundamental rules of procedure.  *See Ogden v. San Juan Cnty.,* 32 F.3d 452, 455 (10th Cir. 1994)

(citing *Nielsen v. Price,* 17 F.3d 1276, 1277 (10th Cir. 1994)).

Plaintiff's pro se status, in and of itself, does not prevent this court from granting

summary judgment.  *See, e.g., Baughman v. Saffle,* No. 00–6296, 2001 WL 1241329, at *1, *3

(10th Cir. Oct. 27, 2001); *Woods v. Roberts,* No. 94–3159, 1995 WL 65457, at *2–3 (10th Cir. Feb. 17, 1995). Moreover, "[d]ismissal of a pro se complaint for failure to state a claim is proper only where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend." *Kay v. Bemis*, 500 F.3d 1214, 1217 (10th Cir. 2007) (quoting *Curley v. Perry*, 246 F.3d 1278, 1281 (10th Cir. 2001)). The burden is on the Plaintiff to frame a complaint that contains "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[13] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The Court cannot assume facts or make connections on Plaintiff's behalf because "a pro se plaintiff requires no special legal training to recount the facts surrounding his alleged injury, and he must provide such facts if the court is to determine whether he makes out a claim on which relief can be granted." *Hall*, 935 F.2d at 1110.

"When the pro se plaintiff is a prisoner, a court-authorized investigation and report by prison officials (referred to as a *Martinez* report) is not only proper, but may be necessary to develop a record sufficient to ascertain whether there are any factual or legal bases for the prisoner's claims." *Id.* at 1109 (first citing *Martinez v. Aaron*, 570 F.2d 317, 318–19 (10th Cir. 1978); then citing *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987)). Likewise, because pro se litigants may be unfamiliar with the requirements to sustain a cause of action, they should be provided an opportunity to controvert the facts set out in the *Martinez* report. *Id.*

---

[13] While it is true that Plaintiff's Complaint need not establish every element of a prima facie case or list every fact, *Khalik*, 671 F.3d at 1192, Plaintiff believes that "dismissal would not be warranted as long as it is possible to hypothesize facts that would make out claim(s)" based on *In re Mulder*, an Illinois bankruptcy case. Doc. 43 at 3 (citing 307 B.R. 637, 642 (Bankr. N.D. Ill. 2004)). Pursuant to the Tenth Circuit precedent Plaintiff must still allege "sufficiently malleable" facts; the Court will not go beyond its liberal construction of the Complaint to hypothesize facts or claims that are simply not present. *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018) ("The facts are not sufficiently malleable . . . . And as stated, [the Court] will not hypothesize sufficient facts to state a claim, especially when the materials attached to the complaint do not reasonably support doing so and [Plaintiff] does not provide any other showing of [the alleged mistreatment and discrimination].") ; *see also Whitney v. New Mexico*, 113 F.3d 1170, 1175 (10th Cir. 1997) ("Although this court reads *pro se* pleadings liberally, we will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf.").

# IV. ANALYSIS

The Court will first establish the scope of its analysis by addressing Plaintiff's attempts to improperly raise new claims outside of his Complaint. Then, the Court must analyze whether the Complaint asserts claims upon which relief can be granted.[14] Fed. R. Civ. P. 12(b)(6). Afterwards, the Court will separately address Plaintiff's Section 1983 claims. Lastly, the Court will consider whether the remaining issues are appropriate for summary judgment by determining whether the record establishes the absence of a genuine dispute of material fact. Fed R. Civ. P. 56.

## A. Plaintiff's Potential Request for Leave to Amend Complaint

The Court is tasked with analyzing the claims it discerns from liberally construing Plaintiff's Complaint. *See Hall*, 935 F.2d at 1110, 1110 n.3. However, Plaintiff asserted new claims, outside the Court's liberal interpretation, in his responses and surresponses to Defendants' *Martinez* Reports and motions. Although legal theories not raised in the Complaint are not properly before the Court, *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1091 (10th Cir. 1991), the inclusion of new allegations in a response to a motion for summary judgment or dismissal is construed as a potential request to amend the complaint pursuant to Fed. R. Civ. P. 15(a). *Adams v. 3 Pipeline Constr., Inc.*, 30 F.4th 943, 971 (10th Cir. 2021). However, the Court may deny a motion for leave to amend when deemed futile, the determination of which is functionally equivalent to the question of whether a complaint would be dismissed for failure to

---

[14] It appears that Plaintiff is confused as to which claims may be raised in federal court. *See* Doc. 52 at 7-8 ("[Defendants] are trying to apply state court rules in an effort to persuade the Court to dismiss Plaintiff's Complaint, that court rule being [the] New Mexico Civil Rights Act. . . ."). Plaintiff believes that because Defendants removed this case from state court, that he is therefore preempted from asserting violations of state law(s). *See id.* Relatedly, Plaintiff seems to think that Defendants' arguments to dismiss under Fed. R. Civ. P. Rule 12(b)(6) to be based on the fact that he is raising state court claims in federal court. *See id.* Such is not the case; Defendants argue that the Plaintiff's alleged facts do not fulfill the statutory requirements of his claims. Since Judge Vázquez articulated the Court's supplemental jurisdiction in her Memorandum Opinion and Order (Doc. 8) denying remand, the Court will avoid undue repetition here.

state a claim. *Id.* at 972; *Bauchman ex rel. Bauchman v. W. High Sch.*, 132 F.3d 542, 562 (10th Cir. 1997).

Plaintiff first attempts to raise interrelated violations of the First Amendment Petition Clause and the Fourteenth Amendment Due Process Clause in his Response to Defendant Maciel's *Martinez* Report and *Motion*. Doc. 43 at 4 ("[A]nd what makes [Defendant Maciel] liable is he violated policy and procedure and a violation of policy and procedure, is a violation of due process, procedural and perhaps statantial [sic]."); *id.* at 5 ("The First Amendment to the United States Constitution affords everyone the right to petition their government for redress a denial of that right is a violation of due process."). Although Plaintiff does not make these arguments explicitly in his Response to GEO Defendants' *Martinez* Report and *Motion*, given these new claims, it is reasonable to assume that Plaintiff might be attempting to allege the same allegations against Defendants Valeriano, Moldonado, and Martinez, due to Plaintiff's comparable focus on their involvement in processing his informal complaints and formal grievances. *See* Doc. 45 at 1-3.

The Court finds Plaintiff's potential request to amend his Complaint to assert First Amendment Petition Clause and Fourteenth Amendment Due Process Clause claims to be futile. There is no constitutional right to effective or accessible prison grievance procedures. *Von Hallcy v. Clements*, 519 F. App'x. 521, 523 (10th Cir. 2013). For a state statute to create a "legitimate claim of entitlement" to a benefit, and therefore an interest protected by due process, it must, "[s]tated simply," place "substantive limitations on official discretion." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460, 462 (1989). Comparatively, the state's voluntary provision of an administrative grievance process does not create a liberty interest in that process; prison grievance procedures are a procedural right, only, and do not confer inmates any

19

substantive right. *Gonzales v. N.M. Corrs. Dep't*, No. CV 18-00107, 2020 WL 6316344, at *7 (D.N.M. Oct. 28, 2020). Thus, LCCF's grievance procedures do not give rise to a protected liberty interest requiring the procedural due process protections of the Fourteenth Amendment. *Id.* Furthermore, even when an administrative grievance involves a constitutional issue, the failure to effectively respond does not violate the prisoner's First Amendment rights because the right to petition pertains to the right of access to the *courts*, "which is not compromised by the prison's refusal to entertain his grievance." *Boyd v. Werholtz*, 443 F. App'x. 331, 332 (10th Cir. 2011) (unpublished). Therefore, these allegations would fail to state a claim and be subject to dismissal under Rule 12(b)(6), thereby making amendment futile.

Plaintiff also attempted to raise, for the first time, a "separation of power issue on the state and federal level" in his Surresponse to Defendant Maciel's Reply (Doc. 47). Doc. 51 at 2. Immediately preceding his claim, Plaintiff stated:

> Defendant Gary Maciel never addressed the fact that Plaintiff and other Muslims were feed [sic] the same as general population minus the meat product, yet Food Service [sic] was charging more for the religious diets than the cost for the meals served to general population, not to mention the fact that the 'Jewish-Orthodox' religion participants received three prepackaged meals from 'Meat Market' as kosher meals.

*Id.* Plaintiff provided no further explanation, context, or argument.

The Court finds that Plaintiff's potential request to amend his Complaint to allege a separation of powers issue is futile because Plaintiff has not alleged sufficient facts to state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Instead, this allegation is merely an unsupported legal conclusion. *See id.* Plaintiff failed to plead factual content that allows the court to draw the reasonable inference that Defendant Maciel is liable for the misconduct alleged. *See id.* Further, the Court is unaware of any authority, and Plaintiff has cited none, that

the doctrine of separation of powers is a source of individual rights actionable under Section 1983. *Robinson v. Polis*, 810 F. App'x. 619, 621 n.3 (10th Cir. 2020).

### B.  <u>Motion to Dismiss</u>

Plaintiff argues that this case has not been dismissed because "apparently this Court found from the outset that Plaintiff's Complaint presents a prima facie case with [sufficient] factual allegation [sic] . . . otherwise, this Court has an obligation to dismiss any claims that lack merit or cases that are moot."  Doc. 43 at 3; *see also* Doc. 52 at 5 ("It seems quite obvious the [sic] this Court has determined that Plaintiff has raised [viable] claims against the Defendants otherwise this case . . . would have been dismissed long before now.").  Plaintiff incorrectly construes the continuance of this case to mean that he is not subject to dismissal  As subsequently demonstrated, such is not the case.  *See, e.g.*, *Hall*, 935 F.2d at 1110 (affirming dismissal of pro se prisoner's claims).

### i.  <u>Plaintiff's Claim that Defendants Violated the New Mexico State Constitution Under the NMTCA and the NMCRA.</u>

The rights guaranteed under the New Mexico Constitution are not self-executing because the relevant provisions do not supply the necessary rule by which the right may be enjoyed and protected, or the means by which the duty imposed may be enforced.  *See State v. Perrault*, 1929-NMSC-099, 34 N.M. 438, 283 P. 902 (1929).  Therefore, to the extent Plaintiff alleges civil rights violations of the New Mexico Constitution, such claims may only be addressed via (a) the New Mexico Tort Claims Act, N.M. Stat. Ann. §§ 41-4-1 to -27 (NMTCA), or (b) the New Mexico Civil Rights Act, N.M. Stat. Ann. §§ 41-4A-1 to -13 (NMCRA).

### a.  <u>The NMTCA Does Not Apply to Defendant Maciel.</u>

The NMTCA allows plaintiffs to sue governmental entities and public employees.  *See* N.M. Stat. Ann. § 41-4-3(A)-(C), (F) (defining "governmental entity," "local public body," "law

enforcement officer," and "public employee").  Defendant Maciel is a public employee by virtue of his employment by the NMCD.  *See* Doc. 1-1 at ¶ 12.  However, Plaintiff's Complaint only alleges that GEO Defendants are employed by LCCF, thereby omitting whether LCCF is a public or private entity; whether the NMTCA applies to GEO Defendants must be analyzed under a summary judgment standard.

Although Plaintiff may sue public employees like Defendant Maciel under the NMTCA, he is limited to certain kinds of claims.  *See id.* §§ 41-4-4(A), 41-4-5 to -12; 28-22-1 to -5.  In other words, governmental entities and public employees, while acting within the scope of duty, are granted immunity from liability for any tort *except* as waived by either (a) the NMRFRA, N.M. Stat. Ann. §§ 28-22-1 to -5, or (b) Sections 41-4-5 through 41-4-12 of the NMTCA, N.M. Stat. Ann. § 41-4-4(A).  Because the NMRFRA is one of the key citations for Plaintiff's claims and arguments, its waiver of immunity is subsequently analyzed separately.  In regard to the exceptions explicitly listed in the NMTCA, Plaintiff has not fulfilled his burden to specify which exact section(s) he alleges has waived immunity.  *Glover v. Gartman*, 899 F. Supp. 2d 1115, 1153 (D.N.M. 2012).  That alone renders Plaintiff's NMTCA claims insufficient under Rule 8(a)(2), which requires pleadings to include a "short and plain statement of the claim showing that the pleader is entitled to relief."  *Vasquez v. Tafoya-Lucero*, No. CIV. 20-612, 2023 WL 110974, at *6 (D.N.M. Jan. 5, 2023), *report and recommendation adopted*, No. CV 20-612, 2023 WL 2012504 (D.N.M. Feb. 15, 2023) (citing *Pauly v. N.M. Dep't of Pub. Safety*, No. 12-1311, 2014 WL 12696949, at *3 (D.N.M. Feb. 10, 2014).  Nevertheless, only two of NMTCA's listed exceptions could conceivably apply to this case: Sections 41-4-6 and 41-4-12.  *See* Doc. 11 at 7.

First, Section 41-4-6 waives immunity for injuries "caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any

building, public park, machinery, equipment or furnishings." N.M. Stat. Ann. § 41-4-6(A). The negligence must be directly tied to the operation or maintenance of a building which creates a dangerous condition that threatens the general public or a class of users of the building. *Id.* Here, the operation of a building (LCCF) is at issue, and that operation potentially impacts Muslim inmates as a class of users.[15] *See* Doc 1-1. Nonetheless, Plaintiff does not have a viable cause of action against Defendant Maciel under Section 41-4-6 because his claims fail to meet its requirements for waiving immunity.

Plaintiff does not allege, even in a conclusory manner, that Defendant Maciel created or had knowledge of a condition dangerous to the general public or class of users of any building that he may have supervised, operated, or maintained. *See id.* Instead, Plaintiff asserts that Defendant Maciel denied Plaintiff's grievance appeal regarding Plaintiff's dietary complaints related to his religious beliefs–an allegation which pertains to a single decision that allegedly injured a single individual rather than the general public or class of users. *Id.* at 3, 7. Therefore, Plaintiff's only plausible claim against Defendant Maciel under Section 41-4-6 is for negligent supervision. While employees' negligence can be attributed to negligent supervision or training, "a complaint alleging nothing more than negligent supervision is not actionable, because the [NM]TCA does not specify a tort waiver for negligent supervision." *Upton v. Clovis Mun. Sch. Dist.*, 2006-NMSC-040, ¶ 16, 140 N.M. 205, 209, 141 P.3d 1259, 1263.

Second, Section 41-4-12 waives governmental actors' immunity for injuries from a variety of causes,[16] "when caused by law enforcement officers while acting within the scope of

---

[15] Determining whether or not the operation of a building impacts a class of users is immaterial here because the statute is nonetheless inapplicable in this case.

[16] N.M. Stat. Ann. § 41-4-12 explains that immunity is waived for injuries resulting from:

> personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation

their duties." N.M. Stat. Ann. § 41-4-12.  This Section then defines a "law enforcement officer" to mean "a public officer or employee vested by law with the power to maintain order, to make arrests for crime or to detain persons suspected of or convicted of committing a crime, whether that duty extends to all crimes or is limited to specific crimes." *See also Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't*, 1996-NMSC-021, ¶ 7, 121 N.M. 646, 649, 916 P.2d 1313, 1316 ("[I]n order to state a tort claim under the waiver of immunity set out in Section 41–4–12, a plaintiff must demonstrate that the defendants were law enforcement officers acting within the scope of their duties, and that the plaintiff's injuries arose out of either a tort enumerated in this section or a deprivation of a right secured by law.").

Plaintiff's Complaint fails to fulfill the waiver of immunity under Section 41-4-12.  None of the Defendants fulfill the definition of a law enforcement officer, who, in brief, have the authority to arrest and detain individuals.  *See Callaway v. N.M. Dep't of Corrs.*, 1994-NMCA-049, ¶ 11, 117 N.M. 637, 641, 875 P.2d 393, 397, *cert. denied*, 118 N.M. 90, 879 P.2d 91 ("[P]rison guards in the Department of Corrections are not 'law enforcement officers' for purposes of Section 41–4–3(D) because: (1) the principal duties of prison guards are to hold in custody persons who have already been convicted rather than merely accused of a criminal offense; (2) maintenance of public order relates to a public not a penitentiary setting; and (3) although prison guards may have the supplemental power to arrest pursuant to the guidelines of Section 33–1–10, their principal statutory duties are those set forth in Section 33–2–15.") (internal citations omitted).

---

of character, violation of property rights, the independent tort of negligent spoliation of evidence or the independent tort of intentional spoliation of evidence, failure to comply with duties established pursuant to statute or law or any other deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico. . . .

In conclusion, Plaintiff failed to state a claim upon which relief can be granted against Defendant Maciel under the NMTCA.  Therefore, Defendant Maciel is entitled to judgment as a matter of law on Plaintiff's NMTCA claim.

### b.  The NMCRA Does Not Apply to Any Defendant.

As previously mentioned, the NMCRA, N.M. Stat. Ann. §§ 41-4A-1 to -13, is the other vehicle for pursuing alleged violations of the New Mexico Constitution.  While Plaintiff does not directly cite the NMCRA, Plaintiff's Complaint clearly accuses Defendants of violating his civil rights whilst bringing federal and state claims.  *See* Doc. 1-1.  Therefore, the Court will liberally construe the Complaint to assert claims under the NMCRA.

The NMCRA was promulgated on July 1, 2021, to create a private right of action to enforce the New Mexico Constitution against other government officials who could not otherwise be pursued under NMTCA's broad immunity.  *See* N.M. Stat. Ann. §§ 41-4A-4, -12. In other words, unlike the NMTCA, the NMCRA does not provide a general waiver of immunity for civil damages claims brought under the New Mexico Constitution.  *Id.* § 41-4A-4.  Despite Plaintiff's contrary belief (Doc. 43 at 6), the NMCRA explicitly states that it is not retroactive. *Id.* § 41-4A-12.  Thus, any claims that Defendants violated Plaintiff's rights, as guaranteed by the New Mexico Constitution under the NMCRA, prior to July 1, 2021, fail as a matter of law.

However, Plaintiff's claims occurring after July 1, 2021, still fail as a matter of law because the NMCRA provides a limited cause of action.  The NMCRA states that claims must "be brought *exclusively* against a public body."[17]  *Id.* § 41-4A-3(C) (emphasis added).  A "public

---

[17] Plaintiff conflates the purpose of the NMCRA with its application.  *See* Doc. 43 at 9 (claiming that Defendant Maciel's citation to Section 41-4A-3(C) and its language are "contrary to the Legislature's new material enacted in 2021, therefore is quite confusing and misleading" because Plaintiff incorrectly believes that "41-4A-4 of the [NMTCA] prohibits the use of the defense of qualified immunity in any claims for damages or relief under the [NMCRA].") Although the NMCRA prohibits a "public body *or person* acting on behalf of, under color of or within the course and scope of the authority of a public body" from depriving individuals of "any rights, privileges or immunities secured pursuant to the bill of rights of the constitution of New Mexico," that does not inherently mean

body" is defined as "a state or local government, an advisory board, a commission, an agency or an entity created by the constitution of New Mexico or any branch of government that receives public funding, including political subdivisions, special tax districts, school districts and institutions of higher education . . . ." *Id.* § 41-4A-2. No where does the NMCRA define a public body to mean individuals. *See id.* §§ 41-4A-1 to -13. Yet, Plaintiff is suing Defendants in their respective individual capacities. Doc. 1-1 at 2. Therefore, Plaintiff's claims under the NMCRA must be dismissed as a matter of law as to all Defendants.

      ii.  <u>Plaintiff Cannot Bring a Breach of Contract Claim Against Any Defendant.</u>

Plaintiff's Complaint also asserts a breach of contract claim. *See, e.g.*, Doc. 1-1 at 8 (claiming that the RMA menu is "contrary to the Contract Agreement . . . ."); *see also* Doc. 52 at 9 ("This entire case is centered around the fact that Defendant Nancy Maldonado was under contract with Summit Food Services . . . ."). The contract in question is the Food Service Contract ("Contract") between the New Mexico Corrections Department and Summit Food Service Management. Doc. 21-8. The Contract is within the scope of the Court's consideration in determining whether dismissal is warranted under Rule 12(b)(6) because it is central to and referenced in Plaintiff's Complaint, and no parties dispute its authenticity. *Brokers' Choice of Am., Inc.*, 861 F.3d at 1103 ("A district court may, however, consider documents attached to or referenced in the complaint if they 'are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'") (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 n.2 (10th Cir. 2002)). Because the Contract states that "[t]he laws of the State of New

---

that Plaintiff can bring suit against those individuals. N.M. Stat. Ann. § 41-4A-3(A) (emphasis added). Instead, as indicated by Subsection (C), the public body will be "held liable for conduct of individuals acting on behalf of, under color of or within the course and scope of the authority of the public body." *Id.* § 41-4A-3(A). In other words, if an individual acting on behalf of a public body injuries another person, the injured person may then hold only the public body liable for that individual's actions under the NMCRA. It should without saying, however, that depending on the nature of the case, a plaintiff may then also hold the individual liable under other applicable statutes.

Mexico shall govern this Agreement," the Court shall accordingly apply New Mexico state law. Doc. 21-8 at 18; *see also Shoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004) ("Issues involving the formation and construction of a purported [contract] are resolved by applying state contract law."). As explained below, Plaintiff's breach of contract claim fails for three reasons.

First, Plaintiff does not and could not allege that he is a party to the Contract. *See* Doc. 21-8 at 12; *Staley v. New*, 1952-NMSC-102, ¶ 7, 56 N.M. 756, 758, 250 P.2d 893, 894 ("It is the general rule of law that one who is not a party to a contract cannot maintain a suit upon it."). In fact, Plaintiff conceded that Defendants are "correct in one sense, Plaintiff is not a party to the Summit Food Service Contract." Doc. 43 at 6.

Second, Plaintiff has not alleged that he is an intended third-party beneficiary. The exception to the general rule precluding non-parties from suing for breach of contract applies to those with a special status, such as a third-party beneficiary, corporate successor, or assignee of a contracting party. *Bevill Co. v. Sprint/United Mgmt. Co.*, 77 F. App'x. 461, 462 (10th Cir. 2003). Pertinent here are third-party beneficiaries, of which there are two classes: intended beneficiaries and incidental beneficiaries. *Tarin's, Inc. v. Tinley*, 2000-NMCA-048, ¶ 13, 129 N.M. 185, 191, 3 P.3d 680, 686. Only the former (i.e., intended beneficiaries) may seek enforcement of a contract. *Id.* To establish third-party beneficiary status, the primary consideration–and Plaintiff's burden to fulfill–is whether the contracting parties intended to benefit the third party, either individually or as a member of a class of beneficiaries. *Id.* Although the Contract is a government contract from which Plaintiff benefits, the law presumes he is an incidental beneficiary who may not enforce the Contract absent a clear intent to the contrary. *Howes v. N.M. Dep't of Health*, No. 21-0263, 2022 WL 1310419 at *9 (D.N.M. Mar. 31, 2022) (quoting *GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank, Nat. Ass'n*, 671 F.3d

1027, 1033 (9th Cir. 2012)); *see Hunnicutt v. Peters*, No. 20-206, 2022 WL 1078216, at *6 (D.N.M. Apr. 11, 2022) ("[Plaintiff] has alleged no facts pertaining to the contract; he simply offers the conclusory statement that he is a third-party beneficiary to the contract because he, in his capacity as a prisoner, was at the facility where [Defendant] provided food pursuant to the subject contract. That is not enough to show that [Plaintiff] is a third-party beneficiary to the contract, and thus, the Court cannot conclude on the record before it that [Plaintiff] has any standing to sue Defendants for breach of contract."). Plaintiff has made no such arguments and has therefore not met his burden of overcoming this general assumption.

Third, even if Plaintiff were a party to or intended beneficiary of the Contract, Defendants are not parties to the Contract and therefore cannot be held liable for its alleged breach.[18] *Applied Cap., Inc. v. Gibson*, 558 F.Supp 2d 1189, 1209 (D.N.M. 2007); *see also Szantho v. THI of N.M. at Sunset Villa, LLC*, No. A-1-CA-41036, 2025 WL 441775, at *9 (N.M. Ct. App. Feb. 6, 2025) (New Mexico law does not apply the third-party beneficiary doctrine against non-signatory third parties). The Contract clearly states that the signatories are the NMCD and Summit Food Service, LLC, neither of whom Plaintiff is suing. Doc. 21-8 at 12. Instead, Plaintiff is suing Defendant Maciel and GEO Defendants in their individual capacities. Doc. 1-1 at 1-2.

In conclusion, Plaintiff cannot bring a breach of contract claim because he is not a party to the Contract, nor does he allege that he is an intended third-party beneficiary. Even if he were, Plaintiff has failed to sue signatory parties of the Contract. Therefore, Plaintiff's breach of contract claim fails as a matter of law as to any Defendant and must be dismissed.

---

[18] Plaintiff claims that he "is not suing Defendant Gary Maciel under the Food Service Contract as he accerts [sic], but for failure to insure [sic] that the Contract reached by the Department of Corrections and Summit Food Services are followed by the individual(s) directed to provide those services." Doc. 43 at 7-8. In other words, regardless of Plaintiff's compartmentalization of his claims, Plaintiff is nonetheless suing for a breach of contract.

### iii.  Plaintiff Cannot Bring a Federal RFRA Claim Against Any Defendant.

To establish a prima facie federal RFRA claim, Plaintiff must prove that the federal government imposed a substantial burden on his sincere exercise of religion.  42 U.S.C. § 2000bb-1; *Palacios v. Corrs. Corp. of Am.*, No. CV 11-0584, 2012 WL 13076596, at *4 (D.N.M. Sept. 14, 2012).  In recent years, the Supreme Court expanded the RFRA's scope by holding that federal officials could be sued under RFRA in their individual capacities.  *Tanzin v. Tanvir*, 592 U.S. 43, 52 (2020).  But that holding, like the RFRA itself, confined claims for relief to *federally* employed individuals and entities.  *Id.*  Likewise, applying the federal RFRA to state-level entities or officials is unconstitutional.  *Yellowbear v. Lampert*, 741 F.3d 48, 52 (10th Cir. 2014) (citing *City of Boerne v. Flores*, 521 U.S. 507, 529-36 (1997)).

Plaintiff fails to allege that any Defendant is a federal employee.[19]  *See* Doc. 1-1. Because the RFRA can only be brought against federal entities or employees, Plaintiff's federal RFRA claim fails as a matter of law as to any Defendant and must be dismissed.

### iv. Plaintiff Cannot Bring a NMRFRA Claim Against Any Defendant.

New Mexico's version of the RFRA prohibits government agencies from restricting a person's free exercise of religion.  N.M. Stat. Ann. §§ 28-22-1 to -5.  While the NMRFRA shares similar goals to the federal RFRA, the NMRFRA is not simply a mirrored application of the RFRA on a state level.  Section 28-22-4(A) specifies that the NMRFRA and its remedies apply *only* in cases where a governmental agency is a defendant (whereas the federal RFRA permits plaintiffs to sue federal employees in their individual capacities).  *See also Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 78, 309 P.3d 53, 77 ("[A]s a matter of New Mexico law, the

---

[19] Nor could Plaintiff allege that any of the Defendants are federal employees.  Although the Court finds dismissal of Plaintiff's federal RFRA claims under Fed. R. Civ. P. 12(b)(6) appropriate, the Court notes that Plaintiff's federal RFRA claims would also not survive summary judgment.  Defendant Maciel is employed by the State of New Mexico and GEO Defendants are employed by a private corporation.  Docs. 1-1 at ¶ 12, 22 at 2-4 ¶¶ 4, 8, 11, 15.

[NMRFRA] is inapplicable to disputes in which a government agency is not a party.").  The

NMRFRA defines a "government agency" as "the state or any of its political subdivisions,

institutions, departments, agencies, commissions, committees, boards, councils, bureaus or

authorities."  N.M. Stat. Ann. § 28-22-2(B).  No where does the NMRFRA state that it provides

relief against individual defendants.  *See id.* §§ 28-22-1 to -5.

Here, Plaintiff is suing Defendants in their individual capacities.  Doc. 1-1 at 2.  Although

Defendant Maciel works for a state-level government agency, as defined above, that does not

change the fundamental fact that Plaintiff is suing Defendant Maciel as an individual, rather than

a New Mexico government agency.  As such, Plaintiff's claim is legally insufficient as to any

Defendant and must be dismissed.

### v.  Plaintiff Cannot Bring a RLUIPA Claim Against Any Defendant.

RLUIPA prohibits the governmental imposition of a substantial burden upon the

sincerely held religious beliefs of institutionalized persons.  42 U.S.C. § 2000cc-1; *Cutter v.*

*Wilkinson*, 544 U.S. 709, 721 (2005) ("[RLUIPA] protects institutionalized persons who are

unable freely to attend to their religious needs and are therefore dependent on the government's

permission and accommodation for exercise of their religion."); *see also Blair v. Raemisch*, 804

F. App'x 909, 916–17 (10th Cir. 2020) (citing *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312

(10th Cir. 2010)).  By its plain terms, RLUIPA only permits claims against a "government,"

which it defines in relevant part as "(i) a State, county, municipality, or other governmental

entity created under the authority of a State; (ii) any branch, department, agency, instrumentality,

or official of an entity listed in clause (i); and (iii) any other person acting under color of State

law."  42 U.S.C. § 2000cc–5(4)(A).  Numerous circuits, including the Tenth, have held that,

despite defining the term "government" to include "any other person acting under color of State

law," RLUIPA does not provide a cause of action against individual defendants in their

individual capacities.[20]  *See Stewart v. Beach*, 701 F.3d 1322, 1334 (10th Cir. 2012) (collecting

cases).

Plaintiff is suing each Defendant in their individual capacity.  Doc. 1-1 at 2.  Because

RLUIPA does not permit a cause of action for individual capacity claims, Plaintiff's RLUIPA

claims fail as a matter of law as to any Defendant and must be dismissed.

## C. <u>Section 1983 Claims</u>

Much, if not most, of Plaintiff's case focuses on the question of whether Defendants

violated Plaintiff's rights guaranteed by the First Amendment Free Exercise Clause and

Fourteenth Amendment Equal Protection Clause.  *See generally* Doc. 1-1.  Accordingly, Plaintiff

brings claims under 42 U.S.C. § 1983 (Doc. 1-1 at 1), the exclusive vehicle for vindicating

substantive rights guaranteed by the U.S. Constitution.  *May v. Bd. of Cnty. Comm'rs of Dona

Ana Cnty.*, 426 F.Supp.3d 1013, 1017-18 (D.N.M. 2019).

Section 1983 imposes liability on officials, acting under the color of state law, who are

directly and personally responsible for the deliberate deprivation of an individual's constitutional

rights.  42 U.S.C. § 1983; *see also Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir.

1992), *cert. denied*, 509 U.S. 923 (1993).  Private prison companies are state actors for the

---

[20] Plaintiff incorrectly argues that the Supreme Court states otherwise.  Doc. 43 at 8.  Plaintiff cites *Hafer v. Melo*, where the Supreme Court held that "state officials, sued in their individual capacities, are 'persons' within the meaning of *§ 1983*."  502 U.S. 21, 31 (1991) (emphasis added).  This holding applies *only* to Section 1983 claims, *not* RLUIPA.

The circuits adopting the interpretation that RLUIPA does not permit a cause of action for individual capacity claims have recognized the linguistic similarity between "any other person acting under color of State law" in RLUIPA and "under color of" in Section 1983.  *See Stewart*, 701 F.3d at 1334-35 (collecting cases).  However, unlike Section 1983, RLUIPA does *not* create a cause of action for individual capacity claims because Congress enacted RLUIPA pursuant to the Spending Clause.  *See* 42 U.S.C. § 2000cc–1(b)(1) (RLUIPA applies when "the substantial burden is imposed in a program or activity that receives Federal financial assistance . . . .").  As such, these circuits have explained that "Spending Clause legislation is not legislation in its operation; instead, it operates like a contract, and individual RLUIPA defendants are not parties to the contract in their individual capacities" and thus "only the grant recipient–the state–may be liable for [a] violation [of RLUIPA]."  *Stewart*, 701 F.3d at 1335 (internal citations omitted).

purposes of Section 1983 claims. *Giron v. Corrs. Corp. of Am.*, 14 F. Supp. 2d 1245, 1250 (D.N.M. 1998) ("[T]he government function doctrine applies in New Mexico when the state delegates the running of a prison to a private contractor.").

However, prisoners' rights are inherently limited by the fact of incarceration, and may be further curtailed in order to achieve legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see also Washington v. Harper*, 494 U.S. 210, 223 (1990); *Shaw v. Murphy*, 532 U.S. 223, 225 (2001). Thus, once a plaintiff fulfills *all* legal requirements of his claim, defendants may rebut by identifying "legitimate penological interests that justified the [reasonably related] impinging conduct . . . ." *Williams v. Wilkinson*, 645 F. App'x 692, 704 (10th Cir. 2016); *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 349 (1987) ("To ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied . . . ."). Notably, however, some penological interests set forth in the *Martinez* Report appear legitimate and reasonable on their face. *See, e.g.*, *Turner*, 482 U.S. at 79; *Thornburgh v. Abbott*, 490 U.S. 401, 402 (1989); *Hall*, 935 F.2d at 1112-13.

The Supreme Court has identified four factors for Courts to consider when determining whether the impinging conduct is reasonably related to legitimate penological interests:

> (a) whether there is a 'valid, rational connection' between the regulation and a legitimate and neutral governmental interest put forward to justify it, which connection cannot be so remote as to render the regulation arbitrary or irrational; (b) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates, which alternatives, if they exist, will require a measure of judicial deference to the corrections officials' expertise; (c) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, on inmates' liberty, and on the allocation of limited prison resources, which impact, if substantial, will require particular deference to corrections officials; and (d) whether the regulation represents an 'exaggerated response' to prison concerns, the existence of a ready alternative that fully accommodates the

> prisoner's rights at *de minimis* costs to valid penological interests being evidence
> of unreasonableness.

*Turner*, 482 U.S. at 78–79.  The task in considering the *Turner* factors is not to balance the four

factors, but, rather, to determine whether the state shows a "reasonable" relation between the

policy and legitimate penological objectives, rather than simply a "logical" one.  *Beard v. Banks*,

548 U.S. 521, 533 (2006).  While all justifiable inferences must be drawn in the prisoner's favor

with respect to matters of disputed fact, the Court's inferences must accord deference to the

views of prison authorities in disputed matters of professional judgment.  *Id.* at 529–30.

### i.  <u>Some of Plaintiff's Claims are Not Actionable Under Section 1983.</u>

Plaintiff specifically brought his Complaint, in part, "under 28 [sic] U.S.C. 1983 for

negligence, violation of civil rights, negligence per se, and breach of contract . . . ."  Doc. 1-1 at

1.  As established, Plaintiff cannot raise a breach of contract claim as a matter of law–leaving

only the claims of civil rights violations, negligence, and negligence per se at issue.  The Court

will separately analyze Plaintiff's well-pleaded allegations of civil rights violations under a

summary judgment standard.  However, as a matter of law, Plaintiff cannot pursue his

negligence or negligence per se claims under Section 1983.

### a.  <u>Plaintiff Cannot Bring a 1983 Claim for Allegations of Negligence Against Any Defendant.</u>

Despite GEO Defendants' argument that the "Complaint is devoid of any negligence

claim and that theory may not be engrafted into the Complaint," (Doc. 23 at 4) Plaintiff explicitly

raises a Section 1983 claim based in part on negligence.  Doc. 1-1 at 1 ("Plaintiff . . . brings this

Complaint for damages . . . under 28 [sic] U.S.C. 1983 for negligence . . . .").  The Court need

not analyze the requirements of a negligence claim because "[t]he Supreme Court has made it

clear that liability under § 1983 must be predicated upon a '*deliberate*' deprivation of

constitutional rights by the defendant," and not on negligence.  *Woodward*, 977 F.2d at 1399.

Therefore, Plaintiff's negligence claim under Section 1983 must be dismissed.

> ### b.  Plaintiff Cannot Bring a 1983 Claim for Allegations of Negligence Per Se Against Any Defendant.

Similarly, Plaintiff attempts to bring a Section 1983 claim based in part on negligence per

se.  Doc. 1-1 at 1 ("Plaintiff…brings this Complaint for damages . . . under 28 [sic] U.S.C. 1983

for . . . negligence per se . . . .").  Negligence per se requires the violation of a specific law or

statute, which explicitly establishes automatic negligence because the violation in and of itself is

considered a breach of duty.  *Archibeque v. Homrich*, 1975-NMSC-066, ¶ 15, 88 N.M. 527, 532,

543 P.2d 820, 825 (listing the four-part test for negligence per se).

Plaintiff fails to cite any statute or regulation that specifically requires Defendants to

provide him halal meals, nor allege that Defendants violated such a statute or regulation.  *See*

Doc. 1-1; *Palacios*, 2012 WL 13076596, at *8.  Further, the First Amendment Free Exercise

Clause broadly requires that Defendants do not infringe on Plaintiff's exercise of religion and the

Fourteenth Amendment Equal Protection Clause requires that Defendants do not discriminate

Plaintiff from similarly situated individuals.  U.S. Const. amends. I, XIV, § 1.  Both are negative

rights rather than positive rights.  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S.

189, 204 (1989) (Brennan, J., dissenting) ("The Court's baseline is the absence of positive rights

in the Constitution and a concomitant suspicion of any claim that seems to depend on such

rights."); *Obergefell v. Hodges*, 576 U.S. 644, 702 (Roberts, C.J., dissenting) ("Our cases have

consistently refused to allow litigants to convert the shield provided by constitutional liberties

into a sword to demand positive entitlements from the State.").  Because Plaintiff fails to cite any

statutes or regulations which explicitly require Defendants to provide him halal meals, nor

accuse Defendants of violating any such statute or regulation, Plaintiff's conclusory allegations of negligence per se fail as a matter of law as to any Defendant and must be dismissed.

### ii.  Plaintiff Does Not Plead Sufficient Facts to Raise a § 1983 Claim Against Defendant Maciel.

In addition to the types of claims Plaintiff may assert under Section 1983, Plaintiff must also fulfill his burden of alleging sufficient facts that, if assumed to be true, state a claim for relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6); *see also Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570. While it is true that Plaintiff need not assert all facts, he must allege enough facts to state a claim. *See Iqbal*, 556 U.S. at 678; *Khalik*, 671 F.3d at 1192. These requirements go hand in hand with determining whether Defendant Maciel is entitled to qualified immunity. The Court considers "(1) whether the facts that a plaintiff has alleged make out a violation of a constitutional right, and (2) whether the right at issue was clearly established." *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2012) (internal quotation marks omitted).

The facts described in Plaintiff's Complaint mention Defendant Maciel three times. First, in Paragraph 12: "Defendant Gary Maciel is the Director of Adult Prisons for the New Mexico Department of Corrections, at all times pertinent hereto." Doc. 1-1 at 3. Then, in Paragraph 13: "Upon information and belief, Defendant Gary Maciel is responsible for addressing all grievance appeals submitted to the Corrections Department for review according to [NMCD] policy and procedure, and after a thorough review of an appeal, issue its findings and recommendation, within a timely matter." *Id.* Lastly, in Paragraph 19: "Prior to Defendant Gary Maciel denying the Grievance appeal and citing [sic] with Defendant M. Valeriano in her Findings and Recommendation, Plaintiff went on a fourteen day food strike in protest of the meals that Plaintiff was receiving." *Id.* at 7.

These allegations against Defendant Maciel pertain only to his position within NMCD, and not to his rejection of Plaintiff's grievance appeal, which is not actionable in and of itself. *See id.* at 3, 7 ¶¶ 12, 13, 19; *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) ("[D]enial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983."); *see also Larson v. Meek*, 240 F. App'x 777, 780 (10th Cir. 2007) (unpublished) (affirming dismissal of Section 1983 claim where "[n]othing in either the original or the amended complaint indicate[d] any action or omission by [the defendant] beyond his denial of [the plaintiff's] grievances."). Nowhere in Plaintiff's Complaint does he allege or explain how Defendant Maciel's conduct violated his constitutional rights. *Cain v. Bernalillo Cnty. Sheriff's Off.*, No. 22-0673, 2023 WL 4764020, at *5 (D.N.M. July 26, 2023) ("To state a claim for relief under § 1983 . . . . [P]laintiff must plead that each government official, through the official's individual actions, has violated the Constitution.").

Because there is no independent constitutional right to prison grievance systems and the mere denial of a grievance is insufficient to establish a Section 1983 claim, Plaintiff has failed to allege facts that Defendant Maciel violated his clearly established constitutional rights. Therefore, Defendant Maciel is entitled to qualified immunity and dismissal in his favor under Rule 12(b)(6).

### iii. **Plaintiff Cannot Demonstrate the Requisite Personal Involvement Necessary to Establish a Section 1983 Claim Against Defendants Stephenson, Martinez, or Valeriano.**

While each of the GEO Defendants were involved with Plaintiff's general prison conditions, in one way or another, Plaintiff has failed to allege or show that three of the four GEO Defendants–Defendants Stephenson, Martinez, and Valeriano–were personally involved in

the food service that allegedly deprived Plaintiff of his Constitutional rights. *See Palacios*, 2012 WL 13076596, at *8 ("[Plaintiff] does not plead sufficient facts to establish that it was the actions and policies of [Defendants], as opposed to other actors like BOP, that caused this deprivation [of a religious diet].").

Although Plaintiff alleges that Defendants are liable "pursuant to the doctrine of respondent superior, agency or apparent agency," (Doc. 1-1 at ¶ 3) the Supreme Court has found that "vicarious liability is inapplicable to *Bivens* and § 1983 suits" because each official "is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 676, 677. Therefore, Plaintiff must still nonetheless plead that each Defendant, "through the official's own individual actions, has violated the Constitution." *Id.* at 676. As a result, the Supreme Court deemed the term "supervisory liability" to be a misnomer because, in effect, the requirements remain the same. *Iqbal*, 556 U.S. at 677; *see also Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (requiring (1) the supervisor be *personally* involved in the unconstitutional act(s), (2) a causal connection between the involvement and unconstitutional act(s), and (3) the plaintiff provide evidence that the superior acted with the requisite state of mind). Likewise, a supervisor's mere knowledge of his subordinate's conduct is insufficient because it lacks personal involvement in actively furthering the unconstitutional act(s). *Id.* (citing *Iqbal*, 556 U.S. at 676). In short, without any further personal involvement, it is impossible for Plaintiff to allege a successful Section 1983 claim through the theory of respondent superior.

### a. <u>Plaintiff Cannot Demonstrate Any Personal Involvement by Defendant Stephenson.</u>

Defendant Stephenson is, and was at all times relevant to the Complaint, the Facility Administrator at LCCF. Doc. 22-2 at ¶ 1. In this role, Defendant Stephenson possessed facility oversight responsibilities. *Id.* Outside of describing Defendant Stephenson's role, Plaintiff

failed to explain how or when Defendant Stephenson violated Plaintiff's constitutional rights. *See* Doc. 1-1. Additionally, it is undisputed that Defendant Stephenson was not personally involved in formulating or serving the halal diet at the heart of Plaintiff's Complaint. Doc. 22-2 at 1. In fact, Plaintiff conceded that Defendant Stephenson was not personally involved in any religious diet operations conducted by LCCF's Food Services staff. Doc. 45 at 2. Given the lack of personal involvement, Plaintiff's Section 1983 claim fails against Defendant Stephenson.

In light of Plaintiff's concession and his continued focus on Defendant Stephenson's responsibilities, it appears that Plaintiff is attempting to make a respondent superior claim. *See, e.g.*, Doc. 45 at 2-3 (arguing that Defendant Stephenson's "duty and obligation is to ensure that all departments within the facility are operating properly and within the scope of [NMCD] Policy and ACA standards."). However, as already discussed, a violation of Section 1983 requires deliberate personal involvement. *Woodward*, 977 F.2d at 1399. Further, to the extent that Plaintiff is suggesting that Defendant Stephenson knew or should have known of the alleged violation of Plaintiff's constitutional rights, a supervisor's mere knowledge of his subordinate's conduct is insufficient because that lacks personal involvement in actively furthering the unconstitutional act(s). *Schneider*, 717 F.3d at 767 (citing *Iqbal*, 556 U.S. at 676).

In conclusion, Plaintiff has failed to show any instance where Defendant Stephenson directly violated Plaintiff's constitutional rights. Therefore, Plaintiff has failed to demonstrate a genuine issue of material fact, and Defendant Stephenson is entitled to summary judgment as a matter of law.

### b. Plaintiff Cannot Demonstrate Any Personal Involvement by Defendant Martinez.

Defendant David Martinez is, and was at all times relevant to the Complaint, an Assistant Facility Administrator at LCCF. Doc. 22-3 at 1 ¶ 1. In this role, Defendant Martinez is

responsible for overseeing LCCF, "including providing proper oversight of Food Service management, oversight and developing appropriate formal and informal policies, procedures, inmate safety, health and well-being of all residences [sic] at the facility."  Doc. 1-1 at ¶ 7.

It is undisputed, and conceded by Plaintiff, that Defendant Martinez was not personally involved in formulating or serving the halal diet at the heart of Plaintiff's Complaint.  Docs. 22-3 at 1 ¶ 3, 52 at 13.  Although Defendant Martinez does not recall doing so, it is undisputed that his signature appeared in the "Step 4 – Decision of Warden/Designee" portion of Plaintiff's formal grievance.  Doc. 22-3 at 1 ¶ 4.  Thus, Plaintiff's only allegation against Defendant Martinez is that he failed to conduct his own investigation before marking and signing Plaintiff's first formal grievance as resolved.  Docs. 22-1 at 23, 45 at 3.

But the limited involvement of merely reviewing and adopting the recommendation to deny Plaintiff's grievance is insufficient to establish the requisite personal involvement for a successful Section 1983 claim.  *Gallagher*, 587 F.3d at 1069.  Similarly, to the extent Plaintiff is attempting to assert a respondent superior claim for "signing the action taken by Defendants Nancy Maldonado and Moriama Valeriano," (Doc 45 at 3) the Court has already explained that a supervisor's mere knowledge of his subordinate's conduct or denial of a grievance does not fulfill the requisite personal involvement.  *Stewart*, 701 F.3d at 1328 ("Whatever knowledge [a supervisor] may have had when he denied the appeal, his only involvement was to deny the grievance appeal, which is insufficient for § 1983 liability.").

Further, Defendant Martinez was not required to perform his own investigation.  Rather, NMCD Policy explains that it is the Grievance Officer who conducts an investigation and puts together a report and recommendation.  Doc. 21-1 at 12 (NMCD Policy 150501(B)(5)).  The Grievance Officer then delivers the report and recommendation to the Warden or Warden's

39

designee, who then reviews (a much broader term than investigate) the Grievance Officer's findings. *Id.* (NMCD Policy 150501(C)(4)).

In conclusion, Plaintiff has failed to allege any instance where Defendant Martinez directly acted–by his own volition or in furtherance of a subordinate's action(s)–to violate Plaintiff's constitutional rights. Therefore, Plaintiff has failed to demonstrate a genuine issue of material fact, and Defendant Martinez is entitled to summary judgment as a matter of law.

### c. **Plaintiff Cannot Demonstrate Any Personal Involvement by Defendant Valeriano.**

Defendant Moriama Valeriano is, and was at all times relevant to the Complaint, the Grievance Officer at LCCF. Doc. 22-1 at 1 ¶ 1. In this role, Defendant Valeriano is "responsible for thoroughly investigating all informal complaints and grievance's [sic] submitted to her in a timely manner as per [NMCD] Policy 150500, and to issue her findings and recommendations . . . for final approval." Doc. 1-1 at ¶ 11; *see also* Doc. 22-1 at 1 ¶¶ 2-3. Plaintiff's only allegations against Defendant Valeriano is that she relied on Defendant Maldonado's input obtained during her investigation of Plaintiff's first formal grievance and refused to accept Plaintiff's second formal grievance that was repetitive of his first grievance on appeal. Doc. 1-1 at 6.

First, and most importantly, Defendant Valeriano did not have any personal involvement in the formulation or distribution of halal meals underpinning Plaintiff's case. Doc. 22-1 at 2 ¶ 5. As Plaintiff admits, it is "[q]uite to the contrary," and that his "Complaint does not in anyway [sic] claim that Grievance Officer/Coordinator [Valeriano] ever had any direct or indirect role in the work and services provided to inmates by L.C.C.F. Food Service Personnel, or that she had any personal involvement in the formulation, preparation, and delivery to inmates of religious diets." Doc. 45 at 1-2. Instead, Plaintiff is focused on Defendant Valeriano's handling of his formal grievances, particularly the investigation of his first formal grievance. *See id.* at 2. First,

40

as previously explained, Plaintiff does not have an independent constitutional right to effective or accessible prison grievance procedures. *Von Hallcy*, 519 F. App'x. at 523. Second, Defendant Valeriano's denial of Plaintiff's formal grievances do not constitute the degree of personal involvement necessary to sustain a Section 1983 claim. *Gallagher*, 587 F.3d at 1069. In conclusion, Plaintiff has failed to allege any instance where Defendant Valeriano personally and deliberately violated Plaintiff's constitutional rights. Therefore, Plaintiff has failed to demonstrate a genuine issue of material fact, and Defendant Valeriano is entitled to summary judgment as a matter of law.

### iv. Plaintiff Cannot Demonstrate that Defendant Maldonado Violated his Constitutional Rights.

Defendant Maldonado is, and was at all times relevant to the Complaint, the Food Services Manager at LCCF. Doc. 22-4 at 1 ¶ 1. Due to her role, she is the only Defendant who was personally involved in serving the halal diet underpinning this case, and therefore the only Defendant potentially liable for violating Plaintiff's rights guaranteed by the First Amendment Free Exercise Clause or the Fourteenth Amendment Equal Protection Clause. *See id.* at 1 ¶ 3.

### a. Plaintiff Cannot Demonstrate that Defendant Maldonado Violated the First Amendment Free Exercise Clause.

The Free Exercise Clause of the First Amendment requires "government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." *Cutter*, 544 U.S. at 719; *see also* US. Const. amend. XIV, § 1. To allege a violation of the Free Exercise Clause, Plaintiff must allege that a prison policy or regulation substantially burdened his sincerely held religious beliefs.[21] *Williams*, 645 F. App'x at 704 (citing *Kay*, 500 F.3d at 1218).

---

[21] For purposes of this analysis, the Court will not discuss whether Plaintiff's religious beliefs are sincerely held. However, it should be noted that GEO Defendants briefly dispute the sincerity of Plaintiff's religious beliefs in a footnote of their *Motion*. Doc. 23 at 15 n.2.

For a burden to be substantial, it does not require a plaintiff to betray their sincerely held religious beliefs; "a substantial burden also exists if 'the claimant is presented with a choice in which he faces considerable pressure to abandon the religious exercise at issue.'" *Blair*, 804 F. App'x at 918 (quoting *Yellowbear*, 741 F.3d at 55) (citing *Abdulhaseeb*, 600 F.3d at 1315). However, not every infringement on religious exercise is substantial.  The substantial burden test, at a minimum, "requires . . . more than an inconvenience to one's religious practice." *Abdulhaseeb*, 600 F.3d at 1316 (quoting *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007), *abrogated on other grounds by Sossamon v. Tex.*, 563 U.S. 277, 283 n.3 (2011)).

Plaintiff complains that Defendant Maldonado "swayed" him from practicing Islam because of the alleged nutritional and religious inadequacies of the halal diet at LCCF.  Doc. 22-1 at 33.  However, whether an inmate's meal plan violates the First Amendment depends on the accommodations already provided and whether the inmate has proposed reasonable alternatives that minimally burden legitimate penological interests.  *Wilson v. Gonzales*, No. 16-604, 2018 WL 2090686, at *9 (D.N.M. May 4, 2018), *report and recommendation adopted*, No. 16-604, 2018 WL 2432897 (D.N.M. May 30, 2018); *Turner*, 482 U.S. at 90-91 ("[P]rison officials do not have to set up and then shoot down every conceivable alternative method of accommodati[on] . . . . .  But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.").

The relief requested in Plaintiff's first formal grievance was that Food Services "provide strictly 'halal meals' to include poultry, whole ground beef, fish (except catfish), tuna, that meets the daily required 2,000 calories, with no exceptions."  Doc. 22-1 at 3.  Comparatively, the relief requested in Plaintiff's second formal grievance was for "Food Service provide [Plaintiff] with

prepackaged halal meals the same as they do the Jewish religion, or they follow the menu provided by the Department of Corrections and Summit Food Service Management without deviation." *Id.* at 32.

### 1.  Meat Variety and Protein Alternatives

It appears that Plaintiff's main concern is the quantity and variety of meat he receives; he alleges that he receives too little meat and that receiving any protein substitutes is not halal and forcing him to accept a vegetarian diet. Doc. 1-1 at 4, 7-8. Particularly, he is concerned by the fact that for breakfast and lunch, he receives the same meals as the general population, with the exception of meat. In lieu of meat, Plaintiff receives protein alternative including cheese, nuts, eggs, peanut butter, tofu, and legumes. Docs. 21-6 at 1-2, 21-1 at 23. These substitutions are incorporated in the RMA menu, which also states "substitutions of equal value may be made as needed by the Food Service Manager." Doc. 21-5 at 7-11 (original quotation in all capital letters). For dinner, Plaintiff receives a prepackaged halal meal every day. Each week, two of these prepackaged meals contain halal certified meat. On the other nights, he again receives protein alternatives of certified equal nutritional value.

At the outset, Plaintiff makes no claim that his religion requires him to eat a certain amount of meat. The record clearly reflects Plaintiff's repeated claims of what meats he can eat, but nowhere does he ever state that such meats are required. His religious requirements are merely that if Defendants serve him a meal, it must be halal. Doc. 21-3 (Plaintiff's "Request for Religious Diet" form listing prohibited foods). Nonetheless, case law precedent prohibits prisons from requiring religious inmates to accept a strictly vegetarian diet. Namely, the Tenth Circuit found in *Abdulhaseeb* that a pure vegetarian diet excluding all meat is insufficient and a violation

of a prisoner's religious freedom.  *See Abdulhaseeb*, 600 F.3d at 1301; *see also Palacios*, 2012 WL 13076596 (applying *Abdulhaseeb* in a comparable case).

But the present case is distinguishable because, most importantly, Plaintiff is not presented with a "Hobson's choice" of deciding whether to eat a non-*Halal* diet or not eat at all. *Abdulhaseeb*, 600 F.3d at 1316-17.  Unlike in *Abdulhaseeb*, where the only alternative religious diet offered was strictly vegetarian, Plaintiff receives a halal diet, including dinners with halal certified meat, in accordance with his "Request for Religious Diet" (Doc. 21-3) form.  Doc. 22 at 5 ¶ 19; *see also* Doc. 22-4 at 79-85, 91.  Additionally, in his Complaint, Plaintiff admitted to receiving the ten-ounce prepackaged beef stew, which is an exclusively halal-certified prepackaged dinner.  Docs. 1-1 at 4, 22-4 at 86-89; *see also* Doc. 22-4 at 91 (email from My Own Meals, Inc. stating, "you cannot have a meat meal that is both Kosher and Halal . . . ."). The Tenth Circuit has also held that a prisoner's First Amendment rights are not violated where religious meals "were less varied than the regular meals . . . and entirely lacked certain items found on the regular menu."  *Strope v. Cummings*, 381 F. App'x at 878, 880 (10th Cir. 2010).

The Court therefore finds that Plaintiff is not forced to accept a strictly vegetarian diet, and receiving less meat, both in terms of quantity and variety, does not constitute a substantial burden on his religious exercise.  Although Plaintiff's individual preferences may not always be met, personal preference does not equate a sincere religious belief.  *See Vinning-El v. Evans*, 657 F.3d 591, 594 ("A prison is entitled to ensure that a given claim reflects a sincere religious belief, rather than a preference for the way a given diet tastes . . . .").  While all religious beliefs are personal, not all personal beliefs are religious.

## 2. **Dual-Certified Prepackaged Dinners**

Plaintiff alleges that Food Services is providing him kosher dinners in lieu of halal

dinners, which Plaintiff claims is impermissible under Islamic law because kosher meals, in his

implied view, always contain prohibited ingredients.  Docs. 1-1 at 5, 8, 22-1 at 4-5, 7, 25-26, 3.

Plaintiff receives one prepackaged halal dinner every day.  Doc. 1-1 at 7.  Twice per week,

Plaintiff receives a prepackaged meat-based meal, which is exclusively halal certified.  *See* Docs.

22-4 at 91 ("[My Own Meals, Inc.] do[es] offer meat meals but only strictly kosher meals OR

strictly halal meals.  If one of our meals contained meat, it would be either certified halal or

certified kosher but not both."), 22 at 5 ¶ 19 ("Two pre-packaged dinners per week include Halal

meat that is certified Halal by GEO's Halal meat vendor, J&M Food Products Company, a

Division of My Own Meals, Inc.").  The other five prepackaged meals are dual certified as halal

and kosher, which is only possible because they do not contain meat and are therefore not prayed

over.  Doc. 22-4 at 91; *see also id.* at 79-85.  The dual-certified meals are provided by GEO's

food vendor, My Own Meals, Inc., and the exclusively halal certified meat-based meals are

provided by J&M Food Products Company, a division of My Own Meals, Inc.  Docs. 22 at 5, 9-

10 ¶¶ 19, 25, 27-28, 22-4 at 6-7 ¶ 15, 79-81, 86-88.  Comparing Plaintiff's allegations to the

*Martinez* Report, it is evident he misinterpreted the dual-certification labels on vegetarian meals

to mean that because a rabbi determined that the meals were kosher, that the rabbi also

determined that the meals were halal, despite the packaging clearly stating that the Islamic Food

and Nutrition Council of America ("IFANCA") certified the meals as halal.  *See* Docs. 1-1 at 5,

22-4 at 79-92.

Likewise, it logically follows that Plaintiff applies this misconception to mean that his

meat-based prepackaged meals are also dual certified, when the evidence shows that Plaintiff

cannot produce admissible evidence to support his allegation.  In his Complaint, Plaintiff discusses receiving the ten-ounce beef stew prepackaged dinner, which the evidence shows is an exclusively halal certified prepackaged dinner provided by J&M Food Products Company. Docs. 1-1 at 4, 22-4 at 86-89; *see also* Doc. 22-4 at 91 (email from My Own Meals, Inc. stating, "you cannot have a meat meal that is both Kosher and Halal . . . ."). Despite Plaintiff's own admission, he later attempts to backtrack by stating "not once did Plaintiff receive any meal from J&M Food Product Company."  Doc. 45 at 5.  Plaintiff's subsequent unsupported and self-conflicting allegations cannot defeat summary judgment.

### 3. Nutritional Adequacy

Plaintiff also alleges his meal plan is nutritionally inadequate because he supposedly receives fewer than 2,000 calories per day.  Docs. 1-1 at 6, 22-1 at 3-5, 7-8.  Although Plaintiff mistakenly claims that the daily minimum requirement is 2,000 calories (Doc. 1-1 at ¶ 9), GEO Defendants also misconvey the daily requirement to be 3,000 calories.  In actuality, the Contract was amended, effective July 1, 2021, to require 3,200 calories per day.  *Compare* Doc. 21-8 at 2 (amendment), *with id.* at 39 (original section).  Nonetheless, the Court's inquiry is not whether the Contract's requirements were fulfilled, but whether Plaintiff has alleged a "sufficiently serious" deprivation of "the minimal civilized measure of life's necessities." *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998); *see, e.g.*, *Hutto v. Finney*, 437 U.S. 678 (1978) (finding a constitutional violation where prisoners were subjected to a long-term diet of fewer than 1,000 calories per day).

GEO Defendants have provided documentation of the RMA menu template (Doc. 22-1 at 13-17) and the accompanying "Menu Template Report" (Doc. 22-4 at 28-67) with its nutritional breakdown, reflecting the aforementioned protein substitutions, as well as an affidavit by Nancy

46

Moldonado, the LCCF Food Services Manager (Doc. 22-4 at 1-8), all of which show that the halal meal plan provides Plaintiff an average of 3,100 calories per day. GEO Defendants also provided the overarching "Statement of Nutritional Analysis and Adequacy Statement" signed by Angela Bartolotti, the Corporate Registered Dietitian, on January 6, 2022 (Doc. 22-1 at 11), and the Quarterly "Statement[s] of Menu Nutritional Analysis and Adequacy for Lea County Correctional Facility" for 2022 and 2023, all signed by Angela Bartolotti (Doc. 22-4 at 68-76), which confirm the nutritional adequacy of the halal diet provided at LCCF without specifying the number of calories.

Thus, the record undeniably shows that the halal meal plan provides Plaintiff with an average of 3,100 calories per day, which, given the routine case law, the Court finds is sufficient. *See Hunnicutt*, 2022 WL 1078216, at \*4 -\*5 (collecting cases). Despite Plaintiff's conclusory assurances (*see, e.g.*, Doc. 45 at 3) that he does not receive what is reflected in the *Martinez* Reports and that his meals are nutritionally inadequate, he cannot overcome summary judgment with merely conclusory statements. Fed. R. Civ. P. 56(c), (e). Although *Martinez* reports and verified complaints are both treated like an affidavit, to have conflicting affidavits resulting in a material factual dispute and thereby defeating summary judgment, "the nonmovant's affidavits must be passed upon personal knowledge and set for forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Hall*, 935 F.2d at 1111.

### 4. Preparation by Non-Muslims in a Shared Cooking Environment

Because the Court finds the halal diet at LCCF is adequate, only now can the Court address Plaintiff's concerns of how those meals are prepared. Specifically, Plaintiff objects to the fact that his meals are "prepared in Food Service by non-Muslim(s) and in a manner subject

to contamination." Doc. 1-1 at 5. These concerns are assumedly the basis, at least in part, for Plaintiff's proposed alternative of receiving three prepackaged meals a day. *See* Doc. 22-1 at 32.

However, Plaintiff has failed to explain the nature of the alleged possible "contamination" or how it conflicts with his faith, which undermines any argument that this concern arises from a sincerely held religiously belief. Nonetheless, judges in the District Court of New Mexico have held that absence of separate kitchen space, utensils, and cookware, does not represent a violation of the First Amendment. *See, e.g.*, *Hunnicutt*, 2022 WL 457879, at *11. Plaintiff has likewise failed to demonstrate how the involvement of non-Muslims in his food preparation imposes a substantial burden on his sincerely held religious beliefs. *See id.* Accordingly, Plaintiff has failed to fulfill his burden.

Additionally, based on the NMCD policies provided in the *Martinez* Report, there are facially valid penological interests for not providing Plaintiff three prepackaged meals a day. Namely, avoiding unnecessary expenses. As NMCD Policy CD-010100(A) states: "Special diets for inmates whose religious beliefs require the adherence to religious dietary laws shall be made available within the inherent limitation of resources, and the need for facility security, safety, health and order, through standard menu alternatives, canteen selections and Religious Programs." Doc. 21-2 at 2. Plaintiff's religious dietary restrictions are met through "standard menu alternatives" and prepackaged dinners, and thus do not require further accommodation.[22] As a result, Plaintiff has not shown that the halal meal plan provided by LCCF is unreasonable or otherwise fails to achieve a valid penological interest.

### 5. Occasional Monotonous Meals

---

[22] Although Jewish inmates on a kosher diet receive three prepackaged meals a day, the Court will subsequently address the constitutionality of this discrepancy.

Lastly, Plaintiff claims that because he, as well as the general population (Doc. 52 at 3, 10), occasionally receive monotonous meals for up to a week or more, he is being forced to accept a vegetarian diet. Docs. 1-1 at 7, 22-1 at 4-5, 8, 25, 30, 33. In addition to the monotonous meals, Plaintiff still received his prepackaged dinners. Doc. 1-1 at 7; *see also* Doc. 22-1 at 13-17 (the RMA menu shows that prepackaged dinners are served with other food, consistent with Plaintiff's pleadings of receiving the monotonous food alongside his prepackaged dinner).

Admittedly, it is not entirely clear from the record the exact dates or lengths of these occurrences, the number of instances, or which meals (i.e., lunch *or* dinner, or lunch *and* dinner) were impacted. In discussing the same occurrences, Plaintiff sometimes alleges negligibly different lengths of time. For example, in Plaintiff's first informal complaint, in discussing the same instance, he referenced both a week (implying seven days) and "four to five days." Doc. 22-1 at 7-8. The potential substantiality of the burden on his religious exercise is attenuated by Plaintiff's failure to clearly or consistently articulate the underlying incidents. Therefore, the Court will view the facts in the light most favorable to Plaintiff and allow him the benefit of all reasonable inferences to be drawn from the evidence. *Kaus*, 985 F. Supp. at 1281 (citing *O'Block*, 788 F.2d at 1435).

It appears, from piecing together the dates and facts of Plaintiff's filings (both with the prison and the Court), that Plaintiff routinely cites two instances where he received monotonous meals and mentions a third occurrence. First, the four to seven days preceding his first informal complaint on March 16, 2022. Docs. 1-1 at 7, 22-1 at 4, 7. Second, five to six days between around May 29, 2022, through June 3, 2022, which served as the basis for Plaintiff's second informal complaint and formal grievance. Docs. 22-1 at 30, 33. Third, and less clearly, an unspecified instance spanning up to fifteen days. Plaintiff's Complaint stated being "given the

exact same meals daily for upward of ten-fifteen days . . . ."  Doc. 1-1 at 7.  There is no other allegation in the entire record of a period greater than ten days.[23]  The only plausibly related timeframe is Plaintiff's two-week hunger strike on June 10, 2022.  *Id.*; Doc. 45 at 5.  The Court handles this ambiguity by considering it a third instance, in Plaintiff's favor, but is unable to discuss when this instance occurred.  Further, Plaintiff routinely switches between alleging these instances impacted either lunch *and* dinner or lunch *or* dinner.  The Court presumes that there were instances of both, but without more details, the Court will construe the ambiguity in Plaintiff's favor and assume that the instances impacted both lunch and dinner.

However, departure from either the RMA or regular menu, resulting in occasional, monotonous meal rotations lacking meat, does not rise to the level of a substantial burden.  The Tenth Circuit found in a similar case that a prisoner's First Amendment rights to exercise his religion were not substantially burdened where religious meals were on a monotonous two-to-three-week rotation, less varied than the general population's meals, entirely lacked certain items on the regular menu, and caused numerous cases of food poisoning.  *Wishneski v. Dona Ana Cty.*, 08-cv-348, 2009 WL 10708582, at *4 (D.N.M. Feb. 19, 2009), *report and recommendation adopted as modified*, 2009 WL 10708217 (D.N.M. May 7, 2009); *see also Hunnicutt v. Peters*, No. CV 20-206, 2022 WL 457879, at *10 (D.N.M. Feb. 15, 2022), *report and recommendation adopted*, No. CV 20-206, 2022 WL 1078216 (D.N.M. Apr. 11, 2022) ("[O]ccasional lapses in food service, periodically missing side dishes, and isolated incidents of undercooking to the point of causing illness do not constitute serious food deprivation."); *Blair*, 804 F. App'x at 919 ("[S]poradic service of inedible religious meals does not rise to the level of a substantial burden .

---

[23] The closest was in Plaintiff's Surresponse to GEO Defendants' *Martinez* Report and *Motion*, stating "Defendants refuse to acknowledge that serving beans and rice of some sort seven (7-10) to ten days for either lunch or dinner . . . ."  Doc. 52 at 10.

. . .”); *Beauchaine v. Winder*, No. 07-CV-657, 2009 WL 3064697, at *9 (D. Utah Sept. 22, 2009) (declining to find inadequate nutrition where prisoner alleged his food tray was missing items on a daily basis).  Similarly, Plaintiff's allegations regarding monotonous meals do not force him to accept a strictly vegetarian diet and therefore do not constitute a substantial burden on his religious exercise.  *See Abdulhaseeb*, 600 F.3d at 1301 (addressing *always* receiving a strictly vegetarian diet).

  b. <u>Plaintiff Cannot Demonstrate that Defendant Maldonado Violated the Fourteenth Amendment Equal Protection Clause.</u>

   In alleging that Defendants violated his First Amendment rights by failing to provide halal meals, Plaintiff claims that Jewish prisoners receiving a kosher diet are treated more favorably than Muslim prisoners receiving a halal diet.  Doc. 1-1 at 7, 9; *see also* Doc. 22-1 at 5, 7-8, 31, 33.  More specifically, Plaintiff alleges that Jewish inmates receive three prepackaged meals per day, whereas Muslim inmates receive only one prepackaged meal at dinner.  Doc. 1-1 at 7; *see also* Doc. 22-1 at 31, 33.  Liberally construing Plaintiff's Complaint, and recognizing that Defendant Maciel and three of the four GEO Defendants lack the requisite personal involvement necessary for a Section 1983 claim, this discrepancy in treatment raises the question of whether Defendant Maldonado violated the Equal Protection Clause of the Fourteenth Amendment.

   The Equal Protection Clause prohibits states, or individuals acting under the color of state law, from denying "to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1; *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982) (clarifying that the "under color of state law" requirement for a Section 1983 claim and the standard for "state action," as required in a Fourteenth Amendment claim are identical).  Essentially, it is "a direction that all persons similarly situated should be treated alike."  *City of*

*Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Plaintiff has the burden of proving that not only was he treated differently from other similarly situated prisoners because of his religion, but that the differential treatment was driven by a *discriminatory purpose. Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). More simply, Plaintiff must prove (1) discriminatory intent, either directly or circumstantially, and (2) an adverse effect. *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021). As is true in the First Amendment context, Plaintiff's Fourteenth Amendment rights may be curtailed by reasonable penological interests, the reasonableness of which is assessed by the Court's balancing of the four *Turner* factors, discussed above. *Turner*, 482 U.S. at 89.

Here, Jewish and Muslim inmates are similarly situated insofar as both require dietary accommodations. *See* Doc. 22-4 at 2, ¶ 6. However, the mere fact that both Jewish and Muslim inmates have dietary restrictions, which may overlap in part, does not make them similarly situated with respect to *how* their differing dietary restrictions are accommodated. *See Jones v. Carter*, 915 F.3d 1147, 1148 (7th Cir. 2019) ("[T]here is overlap in halal and Jewish kosher requirements . . . . There are differences, to be sure . . . ."); *Shabbaz v. Giurbino*, No. 11-01558, 2013 WL 4854395, at *4 (E.D. Cal. Sept. 10, 2013) ("The provision of different [prisoner] meal accommodations is presumably a product of the fact that Jewish dietary requirements are different from Muslim dietary accommodations."); *Hearn v. Kennell*, No. 07-1235, 2009 WL 3460455, at *6 (C.D. Ill. Oct. 22, 2009) ("[P]laintiff is not similarly situated to the Jewish inmates. The dietary restrictions of Muslims are not the same as those of the kosher diet for Jewish inmates."); *see also Caruso v. Zenon*, No. 95-MK-1578, 2005 WL 5957978, at *15 (D. Colo. July 25, 2005) ("Jewish rules governing the preparation of kosher meals are more stringent than Islamic rules regarding halal meals . . . ."). Thus, Jewish inmates are not similarly situated

to Muslim inmates in all relevant respects. *See Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018).

The Equal Protection Clause does not require precisely identical treatment and resource allocation. *Hartmann v. Cal. Dep't of Corrs. & Rehab.*, 707 F.3d 1114, 1123 (9th Cir. 2013) (citing *Cruz v. Beto*, 405 U.S. 319, 322 (1972)); *see also Thompson v. Williams*, No. C06-5476, 2007 WL 3244666, at *20 (W.D. Wash. Oct. 31, 2007) ("[P]rison officials need not make identical provisions to different faiths, but rather 'must make good faith accommodation of the [prisoners'] rights in light of practical considerations.'") (quoting *Freeman v. Arpaio*, 125 F.3d 732, 736 (9th Cir. 1997) (quotation marks modified). Likewise, NMCD Policy provides that "[a]pproved religious diets shall be prepared according to religious dietary requirements," but also notes that "[t]he diet should be kept as simple as possible, and should conform closely to the foods served to other inmates." Doc. 21-2 at 4 (NMCD Policy 101400(D)(2)). With regard to the first *Turner* factor, the fact that halal dietary restrictions can be met with fewer deviations from the standard inmate menu, resulting in lower costs, supports the reasonableness of LCCF's approach in providing halal meals to Muslim inmates.

Plaintiff's equal protection claim further fails because he has failed to allege or show any discriminatory intent by Defendant Maldonado (or any other Defendant, for that matter).[24] Discriminatory intent is an indispensable element of an Equal Protection claim, which Plaintiff must establish before the burden shifts to Defendants for further explanation for the differential treatment. *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1230 (D.N.M. 2015) ("If the

---

[24] To the extent Plaintiff may argue that a fair inference can be drawn from the record and that the above disparity in treatment was the result of deliberate choice, the mere fact that a deliberate choice may have been in providing Jewish inmates three prepackaged meals a day, while providing Muslim inmates one prepackaged meal a day, does not in itself mean that choice was discriminatory in intent. First, Plaintiff has failed to show how he is similarly situated to Jewish prisoners in all relevant respects. Second, NMCD Policy provided in the *Martinez* Report facially shows a legitimate penological interest in keeping religious diets as cost-effective and similar to the regular diet, when possible. *See Thompson*, 2007 WL 3244666, at *21.

plaintiff can produce evidence of discriminatory purpose, then the burden shifts to the

government to prove that it would have taken the same action without the discriminatory

motivation."); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270

(1977); *cf. Ashaheed*, 7 F.4th at 1244 (inference of discriminatory intent was plausible where

there were threats, refusal to grant Muslim inmate a religious exemption to shaving, *and*

differential treatment of non-Muslims).

In conclusion, because Plaintiff has not shown that Jewish inmates are similarly situated

in all relevant respects and failed to allege discriminatory intent, his Fourteenth Amendment

Equal Protection Clause claim under Section 1983 fails as a matter of law and is subject to

summary judgment.

## D. __Remaining Issues__

The only remaining issues, listed in the order they are addressed, are: (1) whether the

NMTCA applies to GEO Defendants; and (2) whether Plaintiff is entitled to injunctive relief.

### i. __The NMTCA Does Not Apply to GEO Defendants.__

As previously analyzed in regard to Defendant Maciel, the NMTCA allows plaintiffs to

sue governmental entities and public employees. *See* N.M. Stat. Ann. § 41-4-3(A)-(C), (F)

(defining "governmental entity," "local public body," "law enforcement officer," and "public

employee"). However, GEO Defendants are not public employees because they are employed

by a private corporation. N.M. Stat. Ann § 41-4-3(F); Doc. 22 at 2 ¶ 4 ("The GEO Group, Inc. .

. . operates LCCF."); *see also id.* at 2 ¶ 3 ("Plaintiff has sued four individuals who worked at

LCCF at relevant times – Facility Administrator George Stephenson; Assistant Facility

Administrator David Martinez, Grievance Coordinator Moriama Valeriano and Food Service

Manager Nancy Maldonado."). Further, GEO Defendants do not: (1) qualify as any of the

individuals explicitly defined in the statute's definition of a public employee, N.M. Stat. Ann. § 41-4-3(F), including its definition of a law enforcement officer, *id.* at § 41-4-3(D); (2) fall within any of the statute's exceptions to otherwise exempted individuals, *id.* at §§ 41-4-3(F)(7)-(10), (14), (16)-(17); nor (3) meet any other statutory exceptions defining individuals deemed to be "public employees" for purposes of the NMTCA, *see id.* at §§ 24-10B-4 (emergency medical volunteers), 24-10B-8 (licensed emergency medical personnel), 21-28-7 (research park corporations), 33-3-28 (jailers of a county or municipal jail), 59A-54-4 (New Mexico comprehensive health insurance pool), 76-21-22 (agricultural commodity commission), 77-2A-9 (New Mexico beef council).

In conclusion, Plaintiff's NMTCA claim is legally insufficient against GEO Defendants, as employees of a private corporation, and is therefore subject to summary judgment. Even assuming arguendo that the GEO Defendants could be considered public employees, the only conceivably applicable waivers of immunity, N.M. Stat. Ann. § 41-4-6 and N.M. Stat. Ann. § 41-4-12, would not apply due to the same factual insufficiencies that the Court identified with respect to Defendant Maciel.

### ii. Injunctive Relief

In his Complaint, Plaintiff seeks a "permanent injunction against all Defendants for retaliation, disciplinary action, harassment, transfer, and any other form of consequences that may be instrumented against Plaintiff for bringing forth this Complaint." Doc. 1-1 at 9. The Court need not look to the necessity or adequacy of this relief because "a claim for injunctive relief is against a defendant in his or her *official capacity only*, as it seeks to change the behavior of the governmental entity." *Polk v. Bunting*, No. 23-2415, 2024 WL 326459, at *8 (D. Kan. Jan. 29, 2024) (emphasis added) (citing *DeVargas v. Mason & Hanger-Silas Mason Co.*, 844

F.2d 714, 718 (10th Cir. 1988).  Here, Plaintiff's claims are made against the GEO Defendants in their individual capacities and must therefore be dismissed with prejudice under Rule 12(b)(6).

## V.  RECOMMENDATION

For all the foregoing reasons, the Court finds that Plaintiff's claims fail to state a claim for relief, are facially invalid as a matter of law, or are factually insufficient.  Based on these findings, the Court recommends that:

1. Defendant Maciel's *Motion* (Doc. 11) be **GRANTED**;

2. GEO Defendants' *Motion* (Doc. 23) be **GRANTED**; and

3. Plaintiff's Complaint be **DISMISSED** under Fed. R. Civ. P. 12(b)(6) and 56.

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**